V. W. LEGLER, Appellee, v. MUSCATINE CLINIC et al., Appellants.

*Matthew Westrate* and *Dutcher, Walker & Ries*, for appellants.

*C. R. Staffard, J. G. Kammerer*, and *C. J. Lynch*, for appellee.

WAGNER, J.—Prior to December 20, 1926, one of plaintiff's testicles became enlarged, and on or about the aforesaid date, there was performed upon him, by Dr. Bryant, assisted by Dr.  Beveridge, one of the defendants, an operation, by which said organ and a portion of the spermatic cord were removed. Two laboratory tests were made, and one of them showed adenocarcinoma, and the other, embryonic carcinoma of the seminal tubuli, which means primary carcinoma (cancer) of the testicle. After the aforesaid laboratory tests were made, it was deemed advisable to give the plaintiff some X-ray treatments, which were administered by Dr. Howe, a member of the defendant partnership. The object of the X-ray treatments was to prevent the recurrence of the cancer. These treatments were administered at a voltage sufficient to make what is known as a 10-inch gap, with 5 milliamperes of current, at a distance of 15 inches from the surface of the body, and for a period of 40 minutes. The tissue at which the treatment was directed was 4 or 5 inches from the surface of the body. It is shown that it requires approximately 140,000 volts to produce a 10-inch gap. The treatment was administered in a cross-fire fashion, so that the deep rays strike a certain point within the body. The instrument, or machine, by which the treatment is administered, was provided with a copper and aluminum filter, which, when used, prevents what is known as an

X-ray burn. The plaintiff had received three treatments, on the 21st, 22d, and 24th days of January, 1927. Two of these were administered from the front of the body, and the third on the right side of the back of the body. The filter was in the machine at the time of said treatments, and no injury was occasioned by reason thereof. On January 25, 1927, Dr. Howe administered the fourth and last treatment, which was applied to the left side of the back of the body. At the time of this treatment, the doctor failed to put the filter in the machine, and as a result, the plaintiff received a very serious X-ray burn. Immediately after the treatment had been administered, the doctor discovered that he had neglected to place the filter in the machine, and informed the plaintiff that he would have a burn. The record reveals that everything was done that could have been done to counteract the effect of the treatment thus improperly administered. The burn was hemispherical or semi-elliptical in shape, the greatest length thereof being approximately 10 inches, and the greatest width approximately 4½ inches, and was located on the left side of his spine.

It appears that the effect of an X-ray burn is slow in the course of its development. The wife of the plaintiff nursed and cared for him until the latter part of February, when a nurse was obtained, who administered to his relief until the 26th day of the following May, when he was taken to Chicago, to St. Luke's Hospital, where, from the 26th day of May until the 6th of July, he was under the care of one nurse all of the time, and two nurses a portion of the time. While in Chicago, three different operations toward remedying the resulting effect of the burn were performed upon him. The first operation consisted in removing the devitalized portion of the wound, and cutting a portion of the tissue from the right side of the spine, and slipping it over, with a portion thereof remaining intact upon the wound caused by the burn, and connecting the different parts. This operation is denominated in the record a "sliding graft." The depth of the portion of the tissue removed from the healthy side of the body and placed upon the wound, as testified to by one of the doctors in attendance, was about one to two inches. The second operation consisted of trying to remedy the fact that the stitches taken at the time of the first operation were not holding as they should. The third operation was a "skin graft,"

and consisted of taking skin from the shoulder and applying it to the wounded parts. The plaintiff returned to his home in July, at which time about one third of the wound had healed. He improved until in November it had all healed, except an area of about the size of the blunt end of a lead pencil. Thereafter, there was again a breaking down of the tissue, and the unhealed portion enlarged until about the size of a silver dollar. By January, 1928, it had again healed, except a portion about as large as remained unhealed the previous November. The trial was had commencing February 29, 1928. How long after the time of the trial it may be until the wound will entirely heal, was a subject of expert testimony, and is indeed very uncertain. Some of the testimony from medical experts is that, in their opinion, it will completely heal within a few months' time.

The plaintiff is 42 years of age; his expectancy of life, according to the life tables, is 26 years. There is testimony by some of the experts testifying for the defendants that there is likely to be a recurrence of the cancer within a period of from five to seven years, and that recurrence of this type of cancer is usually fatal. The record reveals that, because of the injury received from the burn, plaintiff has expended for medical treatment, nurse hire, and hospital bills a sum of approximately $3,000.

The plaintiff's vocation is farming and stock raising,—operating a farm of 393 acres. He and his uncle have also been engaged in feeding, buying, and selling cattle. He testified that his time is worth, in connection with his business, $2,500 a year. This testimony is not contradicted. He has been totally incapacitated since the time of his injury, and such total disability must necessarily continue for some indefinite period in the future. One of the experts for the defendants testified:

"I have some idea how long it will be before he will be able to do such things as to put on his shoes. I should say that he could do so within a year or two."

At the time of the trial, he was able to bend his body from his hips from a perpendicular about 15 degrees. One of the experts for plaintiff testified:

"I would say that his inefficiency would be all the way from

30 to 50 per cent, and that that condition would be most probably permanent the rest of his life."

Another testified:

"I would put his disability from doing manual labor or anything of that kind at 50 per cent or better for life."

Another gave the following testimony:

"I think 30 per cent of the disability is permanent. That would be conservative."

It thus appears that, even after the wound shall have healed, there will be marked permanent disability during the rest of his life. One cannot read the record without coming to a realization of the truth that the plaintiff has suffered excruciating pain as the result of the burn, and that he will continue to suffer much pain for some considerable time in the future. .

We have referred to the record in the case thus fully, because of the contention of the defendants that the verdict is excessive. The verdict is indeed large; the alleged excessiveness of the same was presented to the trial court in a motion for new trial. It is manifest that plaintiff's efficiency and capacity for performing the duties of his vocation have been materially and permanently impaired. It is unquestioned that he has suffered extreme agony, and will continue to suffer severely for an indefinite period in the future. The approximate amount of $3,000 which he has expended is not disputed, and is conceded to be reasonable; nor is the value of his time of $2,500 per year in any way disputed by the record. The trial was conducted in an orderly manner; the jury has fixed the amount, as they saw it, of plaintiff's damages; the amount has passed the scrutiny of the trial court. Under all the facts and circumstances relative to the character and permanency of plaintiff's injury, we do not feel justified in saying that the amount of the verdict is excessive.

It is shown by the record that the plaintiff's wife cared for the plaintiff from the 25th day of January, 1927, the date when the injury was inflicted, until the latter days of the following  month, when a nurse was called. The plaintiff, as a witness, was asked by one of his counsel the following question: "Why didn't your wife continue to take care of you, rather than hire a nurse?" The objection by the defendants that

said question was immaterial and irrelevant was overruled by the court, and the plaintiff answered:

"Well, in the first place, she couldn't stand it, and in the second place, she was not fit for that kind of work, and she collapsed from constant day and night loss of sleep, and exhaustion, worry, and care."

The defendants assign as error the ruling of the court on the aforesaid objection. We find no prejudice resulting from the aforesaid answer. When the wife was upon the witness stand, she answered, without objection: "I continued to administer to my husband's necessaries until I became bedfast." There is very little, if any, difference in the answer of the wife, to which objection was not made, and the answer of the aforesaid question by the plaintiff, to which objection was made. Moreover, the court in his instructions to the jury correctly permitted recovery for compensation for nurses, whether members of the family or not.

The defendants on this appeal present nothing else for our determination.

Since we find no prejudicial error in the record, the judgment of the trial court is hereby affirmed.—*Affirmed.*

ALBERT, C. J., and STEVENS, DE GRAFF, and MORLING, JJ., concur.