[Civ. No. 6288. Fourth Dist. Nov. 9, 1960.]

ARNE SAETER, Respondent, v. THE HARLEY DAVID-
SON MOTOR COMPANY (a Corporation), Appellant.

Wilson & Wilson and William H. Wilson for Appellant.

Leslie C. Gillen, John R. Golden and Richard Chamberlin for Respondent.

SHEPARD, J.—This is an action for damages for personal injuries suffered by plaintiff through alleged negligent and faulty design of a motorcycle. Verdict and judgment went for plaintiff in the sum of $30,000, and defendant appeals.

Plaintiff's complaint was originally in three counts, but the second and third counts were disposed of before submission to the jury, so that the cause went to the jury on only the first count alleging negligence in manufacturing according to a defective design as the proximate cause of the accident and injury complained of.

The facts as shown by the record before us are as follows: Plaintiff was 28 years of age and clearly of sound mental capacity. Prior to the incident complained of, plaintiff had had five or six years of experience in riding motorcycles. He had owned at least five different motorcycles, including one of the same make here in question. He had used them under varying conditions, including commercial delivery service for grocery stores, work for an electrical contractor, and in taking trips. He had had experience of motorcycles wobbling.

In December 1953, plaintiff purchased a new Harley Davidson motorcycle from a dealer in Vancouver, Canada. He rode this motorcycle south through Washington, Oregon and California, a distance of approximately 1,300 miles to the point of accident. He was on his way from Los Angeles to Big Bear, in the San Bernardino Mountains, to view certain motorcycle races, when the accident happened on Highway 60, near Hunter Avenue, between Pomona and Riverside. The only account of his experiences with this motorcycle is from him alone, and is thus completely uncontradicted. The portions of his testimony with which we are here concerned are most lucidly clarified by quotations from the record itself.

Preliminarily, it should be noted that the testimony shows

the meaning of the following terms in relation to the motorcycle here in question to be: "rake"—the angle of the kingpin and forks through which the front wheel is attached to the frame of the motorcycle; "trail"—the horizontal distance between the top of the kingpin to the center of the front wheel; "forks"—two steel arms extending from the bottom of the kingpin and attached on each side of the axle of the front wheel, by which the front wheel is secured through the kingpin to the frame of the motorcycle; "kingpin"—the round, hollow steel post extending from the top of the forks and fitting into a hole in the front of the frame by which the forks and wheel are attached to the frame and the top being attached to the handlebars, allowing the rider to guide the front wheel; "damper"—a device for producing friction in the kingpin or spindle, to prevent wobbling or shimmy at high speed. It consists of a tapered, split steel rod running from the top to the bottom of the spindle or kingpin, with a locked nut on the bottom and a knob attached by screw threads at the top so that when the knob is turned by hand, pressure can be applied to friction plates, thereby tightening and impeding the turning of the kingpin. The particular damper here in question had no adequate device to lock the damper knob in a set position, the theory of design being that it would hold itself in position by its own friction.

Relating to his first discovery of fault with the machine, plaintiff testified:

"A. I noticed it [a shimmy] as I passed through Seattle—I started to notice it."

Next, relating his observation as he moved south through Washington, he said:

"A. . . . It had a tendency to waver when I crossed the lines at Washington into the state of Oregon, that is when I first noticed it."

Next, questioned as to his observation proceeding south from Portland, he said:

"A. Well, I increased my speed at some stages of the trip and up to 50 miles an hour and I would tighten the damper and it had this tendency to unwind. It wouldn't stay in the locked position. When the damper was tightened, it still had this uneasy feeling, uneasy waver even at 50 miles an hour and then I would tighten the damper."

. . . . . . . . . . . . .

"A. I had run into this trouble with the damper unwinding

and the wobbling. The bike would wobble from side to side and I then had to tighten the damper.''

. . . . . . . . . . . . . .

''Q. When you say that the condition increased between Portland and San Francisco? A. San Francisco, right.''

Questioned next respecting his experiences after he left San Francisco, he said:

''A. Yes, I noticed when I went over 50 miles an hour, increased my speed a little over I would get one of those speed wobbles with the bike.

''Q. You mean more severity? A. Yes.

''Q. What did you do to correct that? A. I would tighten the damper and slow down a little and start off again with the damper tight.

''Q. In each instance attaining a speed of 50 miles an hour you found you would go into an extreme speed wobble did you always find the damper loose? A. Yes, it was beginning to get worser [*sic*].''

Next, questioned as to his experiences south of San Luis Obispo, he said:

''A. Well, the bike ran as it did throughout the entire trip and I had to watch the damper, so at that time I still knew I always had to keep an eye on the bike and steering damper.

''Q. An eye on your bike. What did you do next about it? That is my question. A. Kept an eye on the shimmy.

''Q. Was that present all along on Highway 60? A. Yes, it was.''

. . . . . . . . . . . . .

''A. It is hard to say how often and it could happen, wobble and then tighten it, and then go along for awhile and it would unwind itself a couple of times and then you could start off and it would stabilize and then upon accelerating and then riding along and the damper would loosen.''

Relating, on cross-examination, his experiences between Seattle and Portland, he said:

''A. Yes. I noticed now as I was increasing my speed to fifty miles an hour I would have to tighten the damper because riding the bike with the way the damper was was completely unsafe with the damper unwound—and as I rode the bike at fifty miles an hour I noticed when I tightened the damper I didn't get this experience—before the damper was unwound at a slower speed, but after tightening the damper at fifty miles an hour it was unwinding and wouldn't stay in a set position, three-quarter or one-half position.''

. . . . . . . . . . . . . .

"Q. You say the machine was completely unsafe unless the damper was down? A. Completely unsafe; I would say the bike was unsafe with the damper unwound."

. . . . . . . . . . . .

"Q. At that time you had concluded that the machine was completely unsafe, but you didn't know why? A. Didn't know why."

. . . . . . . . . . . .

"Q. At that time [San Francisco] did you consider it a dangerous instrument to ride? A. I did. It was giving me trouble, yes."

After leaving San Francisco, he related the following:

"A. No. I was perhaps at that time when I did seventy miles an hour—I would check the damper to see that it was fully tight and I was watching that, and I would have to put my hand over to make sure that it stayed fully tight, and then I felt that if the rake and trail was right that it should be all right, but the steering damper would rotate and the bike would wobble and get worse.

"Q. Get worse? A. The damper would slowly unwind and it would wobble if I didn't tighten it down, and I would have to tighten down the damper."

Relating his experience between Los Angeles and Pomona, he said:

"A. In hours if I was doing 50 miles an hour I would have to see pretty close to it. I would have to watch it and tighten it when it became unwound and I would tighten it back up. Q. My question, Mr. Saeter, is how many times an hour, riding at 50 miles an hour would you have to check it? A. Numerous. I cannot say six times, ten times. I can't remember, but it was numerous."

After leaving Pomona and before the accident, the wobbling still continued. Other testimony of plaintiff was similar to the foregoing. The complaint also charged negligence in improper design of the rake and length of the front fork, but no evidence was adduced that in any way supported this allegation, and plaintiff's own expert witness testified the motorcycle was satisfactory in these respects.

Counsel have not cited, nor has this court been able to find after a full reading of the transcript of the testimony, any evidence that in any way contradicts any of the foregoing, nor any suggestion that plaintiff did not realize many days and many hundreds of miles before the accident that the defective condition of the damper, causing the wobble and

shimmy of the front wheel, was dangerous at the speed of 50 to 55 miles per hour at which the accident occurred. To the contrary, the testimony clearly shows that he did understand.

During the trip from Vancouver to the point of accident, he stopped at the shops of Harley Davidson dealers or other motorcycle shops in Portland, Oregon; Stockton, San Francisco, San Luis Obispo, Los Angeles, and Pomona, California. At no time did he ever call to the attention of any agent or mechanic the defective damper. He kept this superior knowledge entirely to himself. Respecting the time that the accident occurred, he does not suggest that there was any momentary forgetfulness of this fault. He does not claim that he was under any compulsion of business necessity or otherwise to ride the motorcycle at this time. The testimony shows that this trip was entirely for his own pleasure.

The contention of defendant on this appeal is that plaintiff was guilty of contributory negligence as a matter of law and also that the evidence shows as a matter of law that plaintiff assumed the risk of the alleged dangerous condition. It is, of course, true that as was said in *Anthony* v. *Hobbie,* 25 Cal. 2d 814, 818 [3] [155 P.2d 826]:

"The burden of proving contributory negligence is upon the defendant. [Citation.] True, contributory negligence may be found by the trier of fact from the plaintiffs' own evidence. But cases in which it can be said that the negligence of plaintiff contributes proximately to the accident as a matter of law are rare. The rule has been stated in various ways in a legion of cases, that contributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other; that where there are different inferences that may be drawn, one for and one against, the one against will be followed; and that before it can be held as a matter of law that contributory negligence exists, the evidence must point unerringly to that conclusion."

 But it is also true that where the testimony is subject of but one interpretation, the plaintiff may, under proper uncontradicted facts, be guilty of contributory negligence as a matter of law. (*Fletter* v. *City & County of San Francisco,* 110 Cal.App.2d 820, 824 [244 P.2d 59]; *Olson* v. *Whitthorne & Swan,* 203 Cal. 206, 209 [263 P.2d 518, 58 A.L.R. 129]; *Robinson* v. *King,* 113 Cal.App.2d 455, 457 [2] [248 P.2d 477].)

We are satisfied that the foregoing rules also apply on the

question of determining whether or not a plaintiff has, as a matter of law, voluntarily assumed the risk of a known and appreciated danger. As was said in *Gomes* v. *Byrne,* 51 Cal.2d 418, 420 [2, 3] [333 P.2d 754] :

"The 'elements of the defense of assumption of risk are a person's knowledge and appreciation of the *danger* involved and his voluntary acceptance of the risk.' [Citation; emphasis added.] Thus if plaintiff recognized the *danger* that the dog would bite him, his knowledge was sufficient although he did not know whether the dog had a history of viciousness."

### ASSUMPTION OF RISK

It is not necessary that we here burden the record with a discussion of all the varying detailed circumstances under which assumption of risk might or might not apply. Suffice it to say that in respect to the type of factual situation here under discussion, the principle of assumption of risk applies where a person has actual knowledge of a dangerous condition and who, appreciating that danger, freely and voluntarily exposes himself thereto and suffers injury proximately resulting therefrom. One distinction between assumption of risk and contributory negligence is that contributory negligence is itself a proximate cause of the injury complained of (*Robinson* v. *King, supra*), while assumption of risk will bar a recovery even though its plays no part in causation of the accident except the exposure to danger under the conditions above outlined. (*Kite* v. *Coastal Oil Co.,* 162 Cal.App.2d 336, 346-347 [328 P.2d 45].)

 In determining whether or not a person had knowledge of a dangerous condition and whether, with such knowledge, he assented to or assumed the risk of such danger so as to bar a recovery by him for injury therefrom, consideration must be given to the age, experience and capacity of the person involved, along with the other circumstances shown by the evidence. (*Kite* v. *Coastal Oil Co., supra*; *Ching Yee* v. *Dy Foon,* 143 Cal.App.2d 129, 137 [10] [299 P.2d 668] ; *Prescott* v. *Ralphs Grocery Co.,* 42 Cal.2d 158, 162 [6] [265 P.2d 904] ; *Bazzoli* v. *Nance's Sanitarium, Inc.,* 109 Cal.App. 2d 232, 237 [5] [240 P.2d 672] ; *Covely* v. *C.A.B. Construction Co.,* 110 Cal.App.2d 30, 33 [5] [242 P.2d 87] ; *Mountain* v. *Wheatley,* 106 Cal.App.2d 333, 338 [2] [234 P.2d 1031].) It should be noted in reading these cases that the more recent decisions have established that knowledge must be actual, but that change does not affect the situation in the case at bar

because knowledge here, by plaintiff's own testimony, was, in fact, actual.

It is inconceivable that in this day of common use of motorcycles at high speeds, any person of ordinary intelligence could fail to appreciate immediate danger when the front wheel of a motorcycle at 50 miles per hour developed a rocking or wobbling motion seriously affecting the steering of the vehicle. But above and beyond that, we here have a person with several years of experience with motorcycles, having owned and commercially operated five other machines. He was not a young boy. He was fully mature and experienced. He repeatedly asserts that he knew the damper kept unwinding and that this condition was dangerous. He could not help but understand and appreciate that an accident at 50 miles per hour would be likely to produce serious injury or death both to himself and to other travelers near him on the highway. The uncontradicted evidence can be given only one interpretation by any reasonable person. It points unerringly to only one conclusion, and that is that plaintiff, with full knowledge and appreciation of the danger from the constantly unwinding damper and the resultant steering wobble, nevertheless freely and voluntarily chose to assume the risk of that danger.

### CONTRIBUTORY NEGLIGENCE

Vehicle Code, section 24002, provides: "It is unlawful to operate any vehicle or combination of vehicles which is in an unsafe condition, . . ." Common knowledge dictates that from the standpoint of safety of both the occupants of the vehicle involved and of other vehicles on the highway, the steering mechanism is probably the most vital of all parts of a motor vehicle.

" 'Negligence is the doing of some act which a reasonably prudent person would not do, or the failure to do something which a reasonably prudent person would do, actuated by those considerations which ordinarily regulate the conduct of human affairs. It is the failure to use ordinary care in the management of one's property or person.' B.A.J.I. No. 101." (*Richards* v. *Relles*, 144 Cal.App.2d 416, 417 [301 P.2d 7].)

This is elucidated in *Mosley* v. *Arden Farms Co.*, 26 Cal.2d 213, 216-217 [2, 3] [157 P.2d 372, 158 A.L.R. 872].

" 'Contributory negligence is negligence on the part of a person injured which, cooperating in some degree with the negligence of another, helps in proximately causing the injury of which the former thereafter complains. One

who is guilty of contributory negligence may not recover from another for the injury suffered. . . .' '' (*Freeman* v. *Churchill*, 30 Cal.2d 453, 458 [2] [183 P.2d 4].)

The application of the rule of negligence as a violation of statute is exhaustively discussed in *Alarid* v. *Vanier*, 50 Cal.2d 617, 621-624 [1, 2, 3] [327 P.2d 897]. ▮ There it is pointed out that: ''The presumption of negligence which arises from the violation of a statute is rebuttable and may be overcome by evidence of justification or excuse.'' Various groups of cases had previously held that such justification or excuse for violation of statute may be established by proof of (1) nonnegligent ignorance of the facts which gave rise to the violation; (2) causes or things beyond the control of the person charged with the violation; and (3) causes not of his own intended making which induce him without moral fault to do otherwise. ▮ However, the language used in the second and third groups of cases is disapproved and as a substitute therefor the court states that ''. . . the correct test is whether the person who has violated a statute has sustained the burden of showing that he did what might reasonably be expected of a person of ordinary prudence, acting under similar circumstances, who desired to comply with the law.''

▮ No attempt has been made in the evidence to show justification or excuse. In fact, plaintiff's own uncontradicted evidence affirmatively shows exactly the contrary. As has been hereinbefore noted, we have in the case at bar uncontradicted evidence that plaintiff, with full knowledge of the existence of the dangerous condition, wilfully continued to operate the motorcycle at high speeds for hundreds of miles on the public highways of this state, with almost continuous recurrence and reminders to him of the dangerous condition of the steering mechanism. Before and at the time of the accident complained of, plaintiff knew, or in the exercise of ordinary care must have known, that the motorcycle was in an unsafe condition, both as to himself and to other vehicles near him on the highway. He does not plead nor suggest ''ignorance of fact'' about this condition by way of ''justification or excuse.'' There is no suggestion of ''momentary forgetfulness.'' There is even no suggestion of the slightest compulsion of business or otherwise. The trip was entirely for his own pleasure to view motorcycle races.

The evidence is open to only one interpretation. It points unerringly and without equivocation to contributory negligence as a matter of law. (*Gray* v. *Brinkerhoff*, 41 Cal.2d 180,

184 [2] [258 P.2d 834]; *Huetter* v. *Andrews,* 91 Cal.App.2d 142, 146 [3] [204 P.2d 655].)

Whether the jury mistakenly believed that liability in this case could be assumed on the basis of contract warranty, mentioned in the testimony (the inapplicability of which was never explained to the jury), or on the failure of the court to give the full defense instruction commonly known as BAJI Number 133, in its entirety, or because of undue sympathy, is a fruitless speculation which it is unnecessary to pursue because of the views which we have hereinbefore expressed. We find no fault with the adequacy of the instructions as a matter of law.

The judgment is reversed.

Griffin, P. J., and Coughlin, J., concurred.

A petition for a rehearing was denied December 7, 1960, and respondent's petition for a hearing by the Supreme Court was denied December 28, 1960. Gibson, C. J., and Peters, J., were of the opinion that the petition should be granted.