411 P.2d 183

The CITY OF TUCSON, a municipal
corporation, Appellant,

v.

Mary E. HOLLIDAY, a widow, Appellee.*

No. 2 CA–CIV 88.

Court of Appeals of Arizona.

Division 2.

Feb. 17, 1966.

Rehearing Denied March 8, 1966.

* This appeal was filed with the Arizona Supreme Court and assigned that court's No. 8237. The matter was referred to this court pursuant to A.R.S. § 12–120.23.

crossing is concerned is not unlike that in the case of Vegodsky v. City of Tucson, 1 Ariz.App. 102, 399 P.2d 723 (1965). The intersection is one controlled by lights which, in one phase, flash the word "Walk." During this phase, pedestrians customarily "scramble" through the center of the intersection, many of them crossing diagonally, as did the plaintiff.

At the time of this particular crossing there was a Christmas shopping crowd and a congested situation existed insofar as pedestrians were concerned. In the intersection where the plaintiff was crossing, and outside of the marked crosswalks, there was a definite depression in the pavement about two feet in diameter and about one or two inches deep. In the center of the depression was a circular metal cap approximately eight to ten inches in diameter. The top surface of the paving was beveled down to the edges of this cap. The reason for the depression was that six months prior to the accident in question the City of Tucson had placed an asphalt overlay approximately two inches thick over the existing pavement. When this new paving was performed, the metal cap was not raised and hence the beveled depression was created.

The plaintiff testified that when she stepped into this depression, her shoe became " * * * wedged in this particular hole, * * *" and that she had to " * * * take my left hand on my shoe and work it out of the hole." The plaintiff testified that she was wearing "wedgies" on the occasion in question, which she described as a shoe " * * * where the heel and sole all goes together * * * there is no separate detached heel." She stated that the bottom flat surface of the shoe was the part that became wedged in the depression. She further stated that getting her foot stuck in this hole came as a "complete surprise."

Gordon S. Kipps, City Atty., Tucson, Calvin Webster, former City Atty., Dwight E. Eller, Asst. City Atty., for appellant.

Miller & Pitt, by Robert F. Miller, Tucson, for appellee.

MOLLOY, Judge.

This is a personal injury action brought by a lady who fell in downtown Tucson while crossing at the intersection of Stone and Pennington in a diagonal fashion. The fact situation insofar as the pedestrian

As the result of her fall, the plaintiff suffered a fracture of the triquetrum bone in the right wrist and a fracture of the fibula at the right ankle. Additionally, she suffered certain abrasions. The fall occurred on December 6, 1962, and on February 7,

1963, while exercising in accordance with her doctor's instructions, the plaintiff fell again and sprained her right ankle, which required additional medical treatment.

A jury trial resulted in a verdict for the plaintiff in the sum of $19,000.00. The defendant, City of Tucson, has appealed to this court and the assignments of error will be discussed in the order presented in the appellant's brief.

The first six assignments concern the failure of the court to give various instructions requested by the defendant on assumption of risk. Assumption of risk was one of the defenses raised in the answer and the defendant contends that under the circumstances of this case the instructions should have been given, in addition to the instructions, admittedly appropriate, on the subject of contributory negligence.

In order to determine whether an instruction on assumption of risk should have been given, the evidence should be construed most favorably to the defendant's position, Reichardt v. Albert, 89 Ariz. 322, 361 P.2d 934 (1961), and therefore a few additional bits of testimony should be stated. The plaintiff testified that she was familiar with the depression in question, that she knew that the crosswalks had a better surface for pedestrian traffic than did the center of the street where she crossed, that before crossing the intersection the plaintiff knew the approximate location of this depressed area, and that she made no effort to avoid it when she crossed the street. She stated that she kept her eyes on the "Walk" signal and did not look down while walking because there were too many persons crossing with her so that there was no opportunity to look down.

It is the plaintiff's contention, and one accepted by the trial court, that the defenses of assumption of risk and contributory negligence completely overlap insofar as this case is concerned and that all necessary, applicable law insofar as this defense is concerned was given to the jury when the contributory negligence instructions were given.

The doctrine of assumption of risk, as a separate defense in a tort action, is under vigorous attack by certain well-recognized publicists in the field of torts.[1] The main thrust of the attack upon the doctrine is that other well-established concepts in the law of negligence cover everything that has any validity in the assumption of risk doctrine, that it is duplicitous to give an instruction on assumption of risk and, worse, that it only adds confusion to the case because the concepts embodied in the assumption of risk rule are ill-defined and nebulous and are often misapplied by both court and jury. These attacks by negligence theorists have resulted in the doctrine of assumption of risk being abrogated except in very particularized situations by court decisions in several jurisdictions.[2]

1. Among the attacks made upon the doctrine are: 2 Harper & James, Torts §§ 21.1 et seq. (1956), and particularly § 21.8, pp. 1191 et seq.; James, Assumption of Risk, 61 Yale L.J. 141, 169 (1952); Wade, The Place of Assumption of Risk in the Law of Negligence, 22 La.L.Rev. 5 (1961); P. Keeton, Personal Injuries Resulting from Open and Obvious Conditions, 100 U.Pa.L.Rev. 629 (1952); Mansfield, Informed Choice in the Law of Torts, 22 La.L.Rev. 17 (1961); Green, Assumed Risk as a Defense, 22 La.L.Rev. 77 (1961); Pedrick, Taken for a Ride: The Automobile Guest and Assumption of Risk, 22 La.L.Rev. 90 (1961).

2. McConville v. State Farm Mutual Automobile Ins. Co., 15 Wis.2d 374, 113 N.W. 2d 14 (1962); Felgner v. Anderson, 375 Mich. 23, 133 N.W.2d 136 (1965) (a hunting accident case—assumption of risk defense held to be inapplicable and the defense limited " * * * only to cases in which an employment relationship exists between the parties, as well, perhaps, where there has been an express contractual assumption of risk * * *"— 133 N.W.2d 136, 153); McGrath v. American Cyanamid Co., 41 N.J. 272, 196 A. 2d 238 (1963) ("Experience, however, indicates the term 'assumption of risk' is so apt to create mist that it is better banished from the scene. We hope we have heard the last of it. Henceforth let us stay with 'negligence' and 'contributory negligence.'" 196 A.2d 238, 240–241).

The great weight of authority in this country, however, as established by near recent and current decisions is to the effect that there is a distinguishable defense, sometimes labeled "assumption of risk" and at other times *"volenti non fit injuria,"* which has pertinency to certain factual situations arising in negligence cases.[3] A general statement in this regard is found in an annotation upon this subject, 82 A.L.R.2d 1218, 1228–1230 (1962):

> "Most of the courts take the view that while the defenses of assumption of risk and contributory negligence are closely associated, frequently overlapping or shading into each other, and often difficult to distinguish, the terms often being used interchangeably, nevertheless, the two defenses should not be confused, they are not synonymous, but independent, separate, and distinct defenses, which are not inconsistent and may co-exist and be present in the same case. The two defenses are based on different legal theories."

At least two publicists have ably defended the doctrine as a separate entity.[4] A reading of articles attacking and defending the doctrine will indicate that there is a proclivity of theorists to divide the doctrine of assumption of risk into various "senses" and then either to show that in all of its "senses" the doctrine is covered by other principles of law, such as "no duty" and contributory negligence,[5] or to show that in some of its "senses" there is still a valid meaning not covered by other concepts in the law of negligence.[6] Interestingly, these various dissections of the doctrine end up with pieces of anatomy that only occasionally resemble one another (see notes 5 and 6, supra).

Though much of this war of ideas is carried on with verbiage which would lead the casual reader to believe that it is a battle of semantics rather than basic law involved, underneath the controversy probably lies a basic difference in philosophy. One of the earliest expositions of the doctrine was by Francis H. Bohlen, 20 Harv.L.Rev. 14 (1906) in which is the following:

> "The maxim *volenti non fit injuria* is a terse expression of the individualistic tendency of the common law, which, proceeding from the people and asserting their liberties, naturally regards the

**3.** Among the more recent decisions upholding the defense are: Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Sup.Ct.Tex.1963); Terry v. Boss Hotels, Inc., 376 S.W.2d 239 (Mo.1964); Saeter v. Harley Davidson Motor Co., 186 Cal. App.2d 248, 8 Cal.Rptr. 747 (1960); Erickson v. Van Web Equipment Company, 270 Minn. 42, 132 N.W.2d 814 (1964); Frame v. Grisewood, 399 P.2d 450 (Nev. 1965); Buffalo Shook Company v. Barksdale, 206 Va. 45, 141 S.E.2d 738 (1965); Larson v. Meyer, 135 N.W.2d 145 (N.D. 1965); Quist v. Bressard Distributors, Inc., 24 A.D.2d 420, 260 N.Y.S.2d 394 (1965); Pritchard v. Liggett & Myers Tobacco Co., 350 F.2d 479 (3d Cir. 1965); Perry v. Seattle School District #1, 66 Wash.Dec.2d 786, 405 P.2d 589 (Wash. 1965).

**4.** Prosser, Torts (3d ed. 1964) § 67, pp. 450–469; R. Keeton, Assumption of Risk in Products Liability Cases, 22 La.L.Rev. 122 (1961).

**5.** 2 Harper & James, Torts § 21.1 (1956), and the Supreme Court of New Jersey (Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 155 A.2d 90, 82 A.L.R. 2d 1208 (1959)), divide the doctrine into two senses, "primary," which they say is nothing more than a "no duty" concept and "secondary," which they say is nothing more than contributory negligence. Dean Wade divides assumption of risk into three concepts, consent, lack of duty and contributory negligence (22 La.L.Rev. 5, 14 (1961)).

**6.** Dean Prosser divides assumption of risk into three senses (Prosser, Torts (3d ed. 1964) § 67, pp. 450 et seq.), the primary sense being one of express consent, and the second and third being variations of implied consent; Professor Robert Keeton divides the assumption of risk concept into six different ideas (22 La.L.Rev. 122 et seq. (1961)), the six senses ranging in degree of consent from express assumption of risk to what is called "imposed assumption of risk," the latter being a situation in which there is no showing that the plaintiff actually consented to any conduct on the part of the defendant, but in which the courts have imposed the doctrine.

freedom of individual action as the keystone of the whole structure. Each individual is left free to work out his own destinies; he must not be interfered with from without, but in the absence of such interference he is held competent to protect himself. While therefore protecting him from external violence, from imposition and from coercion, the common law does not assume to protect him from the effects of his own personality and from the consequences of his voluntary actions or of his careless misconduct." 20 Harv. L.Rev. 14 (1906).

That it is this "individualistic" concept that is under fire is indicated by the following quotation from an early treatise advocating abrogation:

"Except for express assumption of risk, therefore, the term and the concept [assumption of risk] should be abolished. It adds nothing to modern law except confusion. For the most part the policy of individualism it represents is outmoded in accident law; where it is not, that policy can find full scope and far better expression in other language." James, Assumption of Risk, 61 Yale L.J. 141, 169 (1952).

The Wisconsin Supreme Court, when it abrogated the doctrine, expressly recognized that it was not merely duplicitous law that was being eliminated:

"In a particular situation the utility of riding with the host and the inadequacy of any alternative course may both be so obvious that the guest's acquiescence *might constitute assumption of risk heretofore existing, but not a lack of ordinary care.* In such circumstances the guest's acquiescence will constitute no defense under the rule we are now adopting."

7. In support of this statement, these authors cite Tharp v. Pennsylvania R. Co., 332 Pa. 233, 2 A.2d 695 (1938); Wright v. City of St. Cloud, 54 Minn. 94, 55 N.W. 819 (1893); Restatement (Second), Torts

(Emphasis added.)   McConville v. State Farm Mutual Automobile Ins. Co., 15 Wis.2d 374, 113 N.W.2d 14, 17 (1962).

Professor Robert E. Keeton attempts to point out the substantive difference in law with the hypothetical case of Black and Blue who borrow a motorcycle, the lender fully warning Black, but not Blue, of a defect in the motorcycle (22 La.L.Rev. 122, 157-159 (1961)). Black, because of the exigencies of the situation, which, hypothetically, is the necessity for emergency medical treatment for Blue, acts as a reasonable prudent man. The defect results in injury to both Black and Blue. In this situation, according to the author, if the assumption of risk doctrine is upheld, Black will not recover but Blue will (assuming some other defense does not defeat recovery). Whether one accepts this answer as a just one may determine whether one attacks or defends the doctrine in question. In this regard, Professor Robert E. Keeton states:

"If one finds this answer unpersuasive, [Blue recovers but Black does not] he will be driven hard toward the conclusion that there is too little of merit in the doctrine of assumption of risk to justify its retention as an independent basis for denial of liability." 22 La.L. Rev. 122, 159 (1961).

That issue is joined in this limited area is indicated by the following quotation from Harper & James, when dealing with assumption of risk in its "secondary" sense:

"A plaintiff may also be said to assume a risk created by defendant's breach of duty towards him, when he deliberately chooses to encounter that risk. In such a case, except possibly in master and servant cases, plaintiff will be barred from recovery *only if he was unreasonable in encountering the risk under the circumstances.*[7] This is a

§ 466, Comments c and d. None of these authorities hold that assumption of risk will *not* lie unless one has been unreasonable in encountering a risk, though they do support the proposition that if one

form of contributory negligence." (Emphasis added.) 2 Harper & James, Torts § 21.1, p. 1162 (1956).

The above quotation from Harper & James points up the area of greatest confusion between the two doctrines. Courts, in applying the doctrine of assumption of risk, have sometimes expressed the thought that the doctrine is applicable whenever the plaintiff knew or *should have known of the risk being encountered*. This appears to have been the situation in New Jersey at the time of the Meistrich decision and was one of the principal reasons for the determination of that court that the doctrine of contributory negligence and assumption of risk were indistinguishable. Meistrich v. Casino Arena Attractions, Inc., 31 N.J. 44, 155 A.2d 90, 92, 82 A.L.R. 2d 1208 (1959).

Recent decisions upholding the doctrine of assumption of risk have held forthrightly that the doctrine has no application if the only inference available is that the plaintiff reasonably *should have known* of the risk. Halepeska v. Callihan Interests, Inc., 371 S.W.2d 368 (Sup.Ct.Tex. 1963); Saeter v. Harley Davidson Motor Co., 186 Cal.App.2d 248, 8 Cal.Rptr. 747, 752 (1960); and see Robert E. Keeton, Assumption of Products Risks, 19 Sw.L.J. 61, 70 (1965).

The battle of theorists to which we have adverted resulted in the American Law Institute adopting [8] a limited version of assumption of risk as a separate defense. Restatement (Second), Torts § 496. The essence of the doctrine adopted is that there must be a certain subjective state of mind in the plaintiff in order for the doctrine to be applicable:

"In theory the distinction between the two [assumption of risk and contributory negligence] is that assumption of risk rests upon the voluntary consent of the plaintiff to encounter the risk and take his chances, while contributory negligence rests upon his failure to exercise the care of a reasonable man for his own protection. Where the plaintiff voluntarily consents to take an unreasonable chance, there may obviously be both.

"There may be, however, differences between the two defenses. A subjective standard is applied to assumption of risk, in determining whether the plaintiff knows, understands, and appreciates the risk. (See § 496 D.) An objective standard is applied to contributory negligence, and the plaintiff is required to have the knowledge, understanding, and judgment of the standard reasonable man. (See §§ 464, 289, and 290.)" Restatement (Second), Torts § 496A, Comment *d*, p. 562.

Another area of confusion prompting rejection of the rule is the statement often expressed by courts that if a danger is open and obvious the plaintiff will be "taken" to have appreciated it. This was the point clarified in Wesson v. Gillespie, 382 S.W. 2d 921 (Tex.1964), where the court held that even though there was no application of the doctrine of assumption of risk merely because the plaintiff *should reasonably* have known of a risk (a raised threshold in this case), under certain circumstances the court is justified in holding as a matter of law that a plaintiff knew and appreciated

has unreasonably encountered a risk, this will constitute contributory negligence. One is thus led to believe that the assumption of risk doctrine, as far as this treatise is concerned, exists in only one "sense," that being in the sense of a rule of law limiting the defendant's duty to the plaintiff.

8. Justice Greenhill in Halepeska v. Callihan Interests, Inc., Tex., 371 S.W.2d 368, 378, indicates in note 3 to his opinion that the American Law Institute Council unanimously accepted the recommendation that assumption of risk remain in the Restatement, despite the opposition of "The Confederacy," consisting of Deans Page, Keeton and Wade, Professors James, Malone, Morris, Seavey and Thurman. Listed as supporting the doctrine were Prosser, Professor Robert Keeton, Judges Fee, Flood, Traynor and Goodrich.

a risk because it was so obvious. Prosser has argued for such an objective standard. Prosser, Torts (3d ed. 1964) § 67, p. 462. It would seem, however, that such imposition of the doctrine by judicial fiat is proscribed in this state by the Arizona Constitution, art. 18, § 5, A.R.S.:

"The defense of contributory negligence or of assumption of risk shall, in all cases whatsoever, be a question of fact and shall, at all times, be left to the jury."

In Miller v. George F. Cook Construction Co., 91 Ariz. 80, 370 P.2d 53 (1962), our Supreme Court embraced the assumption of risk doctrine as a separate defense. In this case the doctrine was expressed in language which might indicate that an objective standard was being adopted rather than the subjective one espoused by the Restatement:

"Whether there was an existing dangerous situation or condition known to the plaintiff, or so obvious *that she must be taken to have known and comprehended it,* and whether there was a reasonably convenient route, other than the one taken, are all questions of fact to be determined by the jury under a proper instruction." (Emphasis added.) 91 Ariz. 80, 83, 370 P.2d 53, 55 (1962).

There is no explanation given as to when the court considered that a plaintiff will be "taken" to have appreciated a risk, and we believe the court had in mind a situation where the jury would be justified in rejecting the plaintiff's testimony of lack of appreciation on the basis of the external facts tending to discredit such testimony. The subjective state of a person's mind is usually proved by circumstantial evidence. In the ordinary case a defendant will not have the benefit of the plaintiff's testimony in this regard and will be relegated to showing the circumstances giving rise to the reasonable inference that the plaintiff must have understood the risk. As Professor Robert E. Keeton has stated:

"Over the years, many of the opinions on assumption of risk have included language in the terms of the first group of jury findings in *Halepeska*—that is, statements that the plaintiff *should* have appreciated the risk, or that he voluntarily exposed himself to a danger that in the exercise of ordinary care he would have appreciated. Enough of this remains in the precedents to make plausible, and perhaps even tenable in some jurisdictions, an argument for assumption of risk on an objective standard (i. e., should have known and appreciated) rather than a subjective standard (i. e., did know and appreciate). This, incidentally, was the substantive point at issue in *Halepeska*. That decision consistently with the prevailing view, which is also adopted in the Restatement, limits the defense to cases of subjective appreciation of risk with one possible exception. That is, there remains a tendency to say that if the danger is open and obvious, one will not be heard to say that he did not appreciate it. If that is only a delicate way of saying to the claimant that his story is a pack of lies or that no jury could reasonably find that he did not appreciate the risk in fact, regardless of what he says, it is consistent with the limitation of assumption of risk to the cases of subjective assumption of risk." (Emphasis in original.) Keeton, Assumption of Products Risks, 19 Sw.L.J. 61, 70 (1965).

Therefore, we do not construe Miller v. George F. Cook Construction Co. as rejecting the Restatement's subjective test as being the essence of the assumption of risk doctrine. We believe that the doctrine, as adopted in the Restatement (Second), is controlling as far as this jurisdiction is concerned, Reed v. Real Detective Pub. Co., 63 Ariz. 294, 162 P.2d 133 (1945), and proceed to apply this law to the facts of this case.

It is very apparent that there has been no express assumption of risk in this action

and that the requested instructions could only be justified under the doctrine of implied assumption of risk. The Restatement (Second), Torts § 496C deals with this concept:

"§ 496C. Implied Assumption of Risk

"(1) Except as stated in Subsection (2), a plaintiff who fully understands a risk of harm to himself or his things caused by the defendant's conduct or by the condition of the defendant's land or chattels, and who nevertheless voluntarily chooses to enter or remain, or to permit his things to enter or remain within the area of that risk, *under circumstances that manifest his willingness to accept it*, is not entitled to recover for harm within that risk.

"(2) The rule stated in Subsection (1) does not apply in any situation in which an express agreement to accept the risk would be invalid as contrary to public policy." (Emphasis added.)

The foregoing should be taken in the light of the introductory comments included in § 496A among which is Comment *b*:

"The defense whose general principle is stated in this Section is given the name, in most jurisdictions, of 'assumption of risk.' A few courts have limited the use of that term to cases of master and servant, or in some instances to other relations where there is a contract between the parties. Such courts have applied the same principle to other situations under the ancient maxim, '*Volenti non fit injuria*,' which signifies that no wrong is done to one *who consents*. The distinction is, however, one without a difference, of terminology only, and the rules applied are the same in either case." (Emphasis added.)

We are dealing with a concept which Professor Robert E. Keeton chooses to refer to as "co-authorship." 22 La.L.Rev. 122, 152 (1961). Merely tolerating the negligence of the defendant is not sufficient for the invocation of the doctrine.

Knowingly taking a risk, without more, fails to differentiate a situation from the commonplace, for every time a person drives a car on the highway, if he is a reasonable person, he knows that he is taking a calculated risk. We hold that there must be some element of acceptance of the defendant's negligence which indicates a willingness on the part of the plaintiff to take his own chances as far as the particular risk created by such negligence is concerned. The Restatement (Second), Torts § 496C, Comment *h*, has pertinency:

"*h. Manifestation of acceptance.* The basis of assumption of risk is consent to accept the risk. In order for assumption of risk to be implied from the defendant's conduct, it must be such as fairly to indicate that the plaintiff is willing to take his chances. Implied consent is consent which exists in fact, but is manifested by conduct rather than by words. *It is not every voluntary encountering of a known and understood danger which is reasonably to be interpreted even as evidence of actual consent.* A plaintiff, for example, who dashes into the street in the middle of the block, in the path of a stream of cars driven in excess of the speed limit, certainly does not manifest consent that they shall be relieved of the obligation of care for his safety. This is merely contributory negligence, and not assumption of risk.

"Since the interpretation of conduct is seldom so clearly indicated that reasonable men could not differ as to the conclusion, it is ordinarily a question for the jury whether what the plaintiff has done is a manifestation of willingness to accept the risk." (Emphasis added.)

█ Applying this law to the situation before the trial court, we believe the trial court was justified in refusing the assumption of risk instructions. The problem before the trial court was to determine whether there was substantial evidence from which the jury might have concluded that Mrs. Holliday as she was crossing the street on

the day in question subjectively had in mind that she was " * * * willing to take his [her] chances" as to known risks of this depression.

What evidence do we have of any such subjective state of mind? The defect in the pavement in question is not one that can be considered as obviously dangerous. Nor did the defendant so consider it, for the record discloses that in objecting to a "defective condition" instruction, requested by the plaintiff, the defendant's counsel stated that objection was made:

" * * * for the reason that there is evidence that if there were any defects in this particular situation, it was one minor defection, and it would not be one that would involve any substantial danger to any person who is paying some slight degree of care for their own safety."

The nature of the defect in question clearly distinguishes this case from that in Miller v. George F. Cook Construction Co., supra, where the defect was an open trench four to five feet deep and twenty to twenty-four inches wide. There is nothing in this record to refute the plaintiff's statement that getting her foot stuck in this depression came as a "complete surprise." As to what circumstances may justify an assumption of risk instruction, the interrelationship of various legal principles involved demands some leeway for the exercise of discretion by the trial judge. This arises from the overlapping of the defenses of assumption of risk and contributory negligence, and the possibility of injecting confusion into the minds of the triers of fact.

The confusion that would have resulted in this case from the giving of the defendant's instructions on assumption of risk is pointed up by the fact that the defendant requested, and the court gave, an instruction (defendant's requested instruction No. 1), which told the jury that there were only four "issues" to be determined by them, to wit, defendant's negligence, its proximate cause, plaintiff's negligence, and its proximate cause. The jury was instructed, as per the defendant's own request, that if they found in favor of the plaintiff on these four issues: " * * * you then *must* fix the amount of plaintiff's damages and return a verdict in her favor." (Emphasis added) There is patent inconsistency between this instruction and the defendant's proposed assumption of risk instructions, seeking to inject an additional issue into the case.

A case relatively in point, recognizing the assumption of risk defense, but holding that there was insufficient evidence in the particular case to show that the defendant appreciated and accepted the risk in question, is Buffalo Shook Company v. Barksdale, 206 Va. 45, 141 S.E.2d 738 (1965). A case upholding the instruction, but indicating that the trial court should be allowed some discretion in this area, is Terry v. Boss Hotels, Inc., 376 S.W.2d 239, 248 (Mo.1964). The Missouri Supreme Court said in this case:

"The circumstance in which reliance on the doctrine of assumed or incurred risk will be approved are exceptional." 376 S.W.2d 239, 248 (1964).

We pass on to the next assignment of error which is to the effect that the trial court erred in excluding evidence that the plaintiff's eyeglasses on the occasion in question were inadequate, the contention being made that this evidence had some pertinency to the issue of contributory negligence.

On direct examination the plaintiff testified that her glasses were in "perfectly operable" condition and that she could see "perfectly normal" with her glasses. She denied that there was any distortion from her glasses. She further testified that the glasses she was using at the time of trial were the same as those she was wearing at the time of the accident and that she had had them for about seven or eight years.

In defense, the defendant called an optometrist who testified that he had refracted the plaintiff's eyes and that his examination revealed that, as corrected by the particular glasses, the plaintiff had 20/100

vision in the left eye and 20/20 vision in her right eye. According to the optometrist the left eye was thus "out of focus" when these glasses were used. The optometrist further testified that normally depth perception largely results from steropsis, which comes from two eyes focusing on the same object. At this point in the testimony, the optometrist was asked by defendant's counsel:

"Could this [one eye being out of focus] affect somebody's ability to notice, say, a depression in a street?"

To this question there was an objection that the question was too general. During the course of argument upon the objection, the defendant's counsel stated: "* * * I believe we ought to be allowed to show that her depth perception was off." Later in the argument, defendant's counsel stated:

"Your Honor, I believe we should be entitled to show that her glasses were incorrect and improper and that these could have contributed to her fall. Now, we can't allow persons to be going around in the streets and suing the City when her glasses could have interfered with her vision at the time she is walking and traversing the street, and then not allow the testimony in."

The court sustained the objection to the question asked and, subsequently, on the motion of the plaintiff, struck the entire testimony of the optometrist. The basis for the court's striking the testimony of the optometrist, as stated by the court, was that the plaintiff had categorically testified that she did not look down on the occasion in question, and thus it was immaterial whether or not she had proper glasses.

On appeal, the plaintiff has questioned whether the defendant sufficiently objected to the striking of the doctor's testimony. Reading the record as a whole, we believe that it is very clear that the defendant did not agree with the court's ruling and made this fact known on the record, together with the reasons why the testimony was material.

■ We hold that it was error to reject the testimony pertaining to the eye-

glasses, in that it has some bearing on the defendant's contention that the plaintiff was contributorily negligent. Neither the court nor the jury was bound to accept plaintiff's testimony that she did not look down on the occasion in question. Graham v. Vegetable Oil Products Company, 1 Ariz. App. 237, 401 P.2d 242 (1965). What is and what is not evidence of either negligence or contributory negligence is a matter about which reasonable persons may differ. However, when the evidence is such that some reasonable persons may conclude that the conduct in question falls below this standard of a reasonably prudent person, we hold that it is error for the court, when a proper offer is made, to reject the testimony.

■ We have given some consideration to whether the rejection in question was prejudicial. We hold that it was. The exclusion of the testimony in question, particularly on a motion to strike, when accompanied by an instruction to the jury to disregard the testimony, may very well have been taken by the jury to be a ruling of the court that matters of this kind should not be considered at all. This was a substantial part of the defendant's defense, and should have been left for the jury to decide.

The next assignment of error pertains to the submission to the jury of an instruction permitting the jury to find damages for future medical expense. The only evidence of possible future expense came from the testimony of two orthopedic surgeons who testified. Plaintiff's doctor testified that plaintiff would have some permanent disability in the right ankle. Without objection, the doctor was permitted to give his "most optimistic" and "most pessimistic view." The most "optimistic" was to the effect that the plaintiff would need no further medical attention by reason of the injuries in question. The most "pessimistic" was that the plaintiff would suffer a neurovascular dystrophy which would require complicated medical treatment. There was also the possibility, according to the doctor, of additional physical therapy. Testimony as to the cost of any such future

medical treatment was very vague. There was a statement that physiotherapy, in the event that the plaintiff reinjured her ankle, would be " * * * seventy-five dollars, or forty-five dollars, depending on how often those treatments were carried out." Office treatments for strapping the plaintiff's ankle, without any indication of how many of these there might be, would be twenty-five to fifty dollars. The doctor testified that if a neurovascular dystrophy occurred, a sympathectomy operation would be required, with a surgical fee of $250.00 and an anesthesia fee of $60.00 to $75.00. If such a procedure were necessary, the plaintiff would be hospitalized from ten to fourteen days at $42.00 per day. There was no indication as to the likelihood of a neurovascular dystrophy occurring and the jury was left entirely to speculation in determining whether such might occur or how it might be caused. On cross-examination, the plaintiff's doctor testified that the likelihood of a neurovascular dystrophy was " * * * remote and speculative in the sense of the word speculation. * * *" The doctor further testified that if the plaintiff were careful where she walked, paid attention to where she was going and did not reinjure her ankle, she would not require additional medical expense. The other orthopedist (defendant's witness) testified that if the plaintiff were his patient he would see her in the future at " * * * infrequent intervals." There was no further estimate as to the number of such required visits nor any testimony as to what an office call upon an orthopedic surgeon might cost.

■ Proper objection was made to the giving of an instruction on future medical expense. We believe that under this evidence, and no more, it was error to submit the question of future medical expense to the jury. A pronouncement of our Supreme Court is deemed pertinent:

"However, the question of future medical expenses is in a different category. Plaintiff's doctor testified that while plaintiff's condition lasted she could be expected to seek medical help to alleviate her pain. Such care would cost $5 a treatment, but no evidence was offered as to how many treatments might reasonably be required nor for how long such care would probably be necessary. This evidence was too indefinite to support an award of damages, and as a result it was error for the trial court to include future medical expenses in Instruction 14. Henderson v. Breesman, supra." [77 Ariz. 256, 269 P.2d 1059 (1954)] Hirsh v. Manley, 81 Ariz. 94, 103, 300 P.2d 588, 594 (1956).

We do not mean to be construed as holding that the *possibilities* of future medical expense may not be considered by a jury, but we do hold that some standard must be given to the jury so that it may judge the probabilities of such expense becoming necessary. We find none in this record and therefore hold that the giving of the instruction on future medical expense was erroneous.

■ Next assignment of error pertains to the giving of an instruction on future loss of earning capacity. From the evidence before the jury, the jury would have been justified in concluding that the plaintiff would have a perceptible limp in her gait because of the injury to her right ankle and that such impediment would be permanent. It was also established in the evidence that the plaintiff was trained as a salesclerk in retail stores and that the impairment in question would seriously handicap her in doing stock work and in otherwise carrying out her normal duties. Under these circumstances, we hold that an instruction on damages by reason of loss of future earning capacity was justified. Atchison, Topeka and Santa Fe Railway Co. v. Parr, 96 Ariz. 13, 391 P.2d 575 (1964).

The next assignment pertains to the giving of an instruction in permitting the jury to allow compensation for reasonable value of services rendered to the plaintiff by her sister during her convalescence from the injury in question. The evidence was that

the sister was not actually compensated by the plaintiff for the services rendered. This assignment presents to this court a situation of almost evenly divided authority. See Annot. 90 A.L.R.2d 1324 (1963).

We approve the view allowing recovery for the reasonable value of nursing care or services rendered gratuitously to a plaintiff by a friend or relative. As we view it, a plaintiff receiving these gratuitous services is actually detrimented. It is a well-known fact that persons wear out their "welcome" with friends and even with relatives unless favors are returned. The moral obligation to repay favors such as this is sufficient detriment to the plaintiff to support an award for the reasonable value of such services, providing they were made necessary by the injury wrongfully inflicted.

We do not pass upon the other assignments of error pertaining to the excessiveness of the damages and the motion for new trial, because as previously indicated, we believe it our duty to send the case back for a new trial.

Reversed and remanded for a new trial.

KRUCKER, C. J., and HATHAWAY, J., concurring.

* This appeal was filed with the Arizona Supreme Court and assigned that Court's No. 8030. The matter was referred to this Court pursuant to § 12–120.23 A.R.S.