573 P.2d 86

John Vincent BUTLER and Ellen R. Butler, husband and wife, Appellants,

v.

Wesley R. WONG, a single man, Appellee.

No. 2 CA–CIV 2372.

Court of Appeals of Arizona, Division 2.

Nov. 9, 1977.

Rehearing Denied Dec. 21, 1977.

John R. Perry, Jr., Law Offices of L. Bernell Solsberry, Nogales, for appellants.

Chandler, Tullar, Udall & Redhair by D. B. Udall, Tucson, for appellee.

## OPINION

HATHAWAY, Judge.

On October 22, 1973, Mr. Butler was attempting to enter the I-10 freeway from the Congress Street on-ramp in Tucson when his automobile was struck from the rear by a vehicle driven by Mr. Wong. The backseat in Mr. Butler's automobile was severely bent as was the sunvisor. Mr. Butler received injuries to his head, neck and shoulders. He later developed deafness which he contends resulted from the accident. Appellants sued and recovered a jury verdict in the sum of $4,270.97. Appellants contend on appeal that they were prejudiced at trial by the exclusion of the deposition of Dr. Bernstein, an ear specialist, who was unavailable to testify at trial.

■ The admissibility of evidence at trial is largely a matter within the discretion of the trial court and will not be disturbed on appeal unless an abuse of discretion is shown. *Throop v. F. E. Young and Company*, 94 Ariz. 146, 382 P.2d 560 (1963). In *City of Tucson v. Holliday*, 3 Ariz.App. 10, 411 P.2d 183 (1966), we held that the trial court committed reversible error in refusing to permit an optometrist to express an expert opinion concerning the plaintiff's ability to see with the glasses she was wearing at the time she fell while crossing a downtown intersection in Tucson. Since the testimony in question comprised a substantial portion of the defendant's case and should have gone to the jury, reversal was required. Appellants contend that the exclusion of Dr. Bernstein's deposition had the same effect.

■ It is not sufficient in an action for damages that plaintiff show a certain injury might have been caused by the negligence of defendant. It is necessary to establish that the injuries have been so caused. *Western Truck Lines, Ltd. v. Berry*, 53 Ariz. 216, 87 P.2d 484 (1939). Medical testimony, although inconclusive, may be of value when considered with the other evidence. This exception to the general rule was stated by us in *Coca-Cola Bottling Company of Tucson v. Fitzgerald*, 3 Ariz. App. 303 at 306, 413 P.2d 869 at 872 (1966):

> "To establish the causal connection between an accident and injury, a *sine qua non* of liability, medical testimony as to the *possibility* of such causal connection, without more, is insufficient. But if there is medical evidence of the possibility of the existence of the causal relationship together with other evidence or circumstances indicating such relationship, the finding that the accident caused the injury will be sustained." (Italics in original)

*Kreisman v. Thomas*, 12 Ariz.App. 215, 469 P.2d 107 (1970) and *Montague v. Deagle*, 11 Ariz.App. 106, 462 P.2d 403 (1969).

The parties accept the legal principle quoted above but disagree as to its application under the facts presented. Appellees agree that the determining factor on whether the testimony of Dr. Bernstein was admissible is whether there was sufficient "other evidence or circumstances" indicating a relationship between the hearing loss and the accident. We have carefully reviewed the record and conclude that there is.

Mr. Butler testified that prior to the accident he had never had trouble with his

hearing. The deafness came upon him on May 4, 1974, after a private plane flight from Tucson to Phoenix. As might be expected, the lapse of time in excess of five months from the date of the automobile accident raises a serious question as to any causal connection between the deafness and the accident. The injuries sustained by Mr. Butler were to his head, neck and shoulders. He sustained a bump on the head and suffered severe pain in movements involving the neck and shoulders. He also had difficulty in the use of his hands and suffered a tingling sensation along the insides of his arms. The problems with his hands interfered with his writing and caused him to give up his avocation of gunsmithing. He experienced "popping" in his neck. The pain and problem in his neck area persisted to the time of trial, as did a constant tension in the shoulders. Immediately after the May 4 flight, when the deafness developed, Mr. Butler testified that when he got out onto the ground he noticed vertigo and deafness which he characterized as "very extreme," and which settled in the left ear. He attempted to clear it up by chewing gum, apparently feeling at the time that the flight may have been a factor in bringing it on. The chewing did not help and antihistamine treatments administered intravenously brought about a marked improvement in the vertigo, and a gradual improvement in the hearing, which apparently stabilized leaving a marked hearing loss. Testimony was given by Mr. Butler that he frequently shot guns, but always used protective devices in his ears. He also testified that he had considerable experience as a pilot, but that neither the shooting nor the flying had in any way in the past interfered with his hearing. Mr. Butler was asked by his attorney:

"Q. Do you know what caused your hearing loss?

A. Yes.

Q. What was that?

A. Definitely that violent whiplash I had in that accident, it's the only thing it could be.

Q. Did you ever have any hearing loss in your left ear prior to this accident?

A. No. No real hearing loss, perhaps coming out of pressurized cabins of the plane, I may pop and then in an hour be cleared up, but I could hear.

Q. Do you ever recall any hearing loss whatever prior to that?

A. No."

The deposition of Dr. Bernstein, an ear specialist, was objected to by defense counsel on the basis that Dr. Bernstein never testified to a reasonable medical probability that the hearing loss is connected with the accident. The trial judge indicated that after he read the deposition he did not believe it was admissible and read into the record the following portion from the deposition which we must agree is ambivalent. Other portions of the deposition do, however, appear to support appellants' efforts to connect the deafness to the accident.

"A. Have I seen things like that? I have seen it all ways. I have seen it all ways. That's why I think I can get a feeling about this condition so I know where to pigeonhole most of these patients, but by a long shot, not all. I have seen it with severe injuries; I have seen severe injuries without it; I have seen it without any injury; I have seen it in well people; I have seen it in sick people; I have seen it in old, in young. I have seen it in so many different ways that there is no way that you can—even an incident, have I seen it in situations like this, sure, I have."

The trial court stated:

"I wanted to read that because it sounds like Dr. Seuss. I don't think it's admissible. Show the objection is sustained."

Elsewhere in the deposition the doctor stated that he had seen Mr. Butler five times, the first time being May 15, 1974. The doctor was cautious in his testimony and cannot be faulted for this. *Southwestern Freight Lines, Ltd. v. Floyd*, 58 Ariz. 249, 119 P.2d 120 (1941). He testified:

"... whiplash injuries are frequently complicated by vertigo and tinnitus,

noises in the ears, and some hearing loss, if there is a concussion involved in it here, but whatever the basis, we don't always know, but we see it. The interval here was kind of long, and so I thought about it more. In the interval, he wasn't free of symptoms. He had other symptoms related to that thing. In his neck, he had some popping in his neck. He was doing daily exercises for this injury to his neck, and so he felt that the effect of this injury had continued, you know, and over a period of time. So under the circumstances, *I couldn't say, in spite of the time interval, that I couldn't relate the two. I felt like I had to give him the benefit of the doubt, to a certain extent, that this must have been in some way related.*" (Italics added)

The doctor indicated that he could not foreclose the accident as the cause as is brought out in the following in another portion of the deposition:

"Q. . . . If those symptoms have disappeared, the cervical symptoms have disappeared, would you still then expect to find the tinnitus and the vertigo and those sort of things that come in your specialty, caused by the cervical problems? Am I making myself clear?

A. Yes, I see what you mean. I would say it is kind of fine. I would have to really give an opinion that could not be considered tremendously valuable, you know. In other words, cause and effect here are not obvious like many times, you know. It is just a question of how do you feel about knowing the story and from what you find and so on. I feel I can't say no. I can't say I am sure that it is. But I feel I can't say no, in all, you know, justice to his situation.

Q. If I ask you to say, to a reasonable medical probability, that it was caused, I would take it your answer would be no, you couldn't go that far, but to a reasonable medical possibility, you would say yes?

A. I might have to go that far, because I have to take one side or the other,

you know. I might have to go that far and relate the two.

Q. Let me ask you. We have got you under oath. Would you, to a reasonable medical probability, would you connect the problems that you are treating to the automobile accident?

A. Well, there again I can't be very forceful. I would like to be. I would like to be really sure, you see, but there is no way that I can be, so I have to use my better judgment, and my better judgment is that having reviewed the story and after following his course, I would suspect that there is some relation. However, and I don't know whether I should volunteer this information or not, I see this type of trouble many times in people who have never had any kind of accident, you see."

The doctor testified that concerning the time interval, he nevertheless could not completely rule out the automobile accident. He testified that the specific deafness problem was "nerve deafness, otherwise called perception deafness." He also testified that the deafness was probably permanent.

The doctor further testified as to the type of injury that could cause the deafness in the following language:

"I have a mental picture of this sensitive nerve tissue in there, and for some reason something happens to it like a shock, maybe an electric shock goes through it and kills it. When it kills that nerve tissue, it could become a blood vessel becomes obstructed, or it could be a change in pressure, or it could be a toxic effect from some medicine, some drug, which he didn't have. We don't know. We seldom do. But when that happens, you get this sudden deafness and vertigo and the tinnitus. He had this right at the beginning, yes. That was no problem in our treatment after I first saw him."

The doctor was then examined with reference to the flying and any connection it may have had with Mr. Butler's deafness as follows:

"Well, you see, the type of hearing problems people have with altitude, and we have all experienced it, you know, is a different thing entirely. That's an aerodynamic thing.

Q. That is a different type of problem?

A. This is a different type of problem. The other one, you blow your ears and you clear them and you are back to normal again. Suddenly the engines get loud again. This is a different problem. This is a nerve tissue in his ear. It is not just a question of what is the air pressure on one side of the eardrum compared to the other. I don't think he will have this again. I mean there is not a reason in the world to think he will have this again."

Testifying further with reference to the time interval, the following was brought out:

"Q. The time interval seems to be the major problem in this case, is that correct, sir?

A. Yeah. I don't like it. It bothers me because I like it the other way. I like it to be real clean-cut so I can put my finger on it and say, 'Look, I can tell you exactly this is the way it is,' but I can't do that, you see, because it is not a clear case of cause and effect. Still, as a doctor, I have to think, you know, and I have to try to rationalize. I try to think of what else, and I can't put it on any other cause. There is nothing in the history that indicates that maybe he drank some poison, or some other unrelated thing, so I have to relate it to this. It is either this or just a happenstance, which we don't understand. That's about the way it is. I can't run it any closer. It is not clear-cut, I will agree with you. What am I to do? He is a patient who tells me a story, and I have to grant him some credence, you know, and I do."

Although the testimony is not forceful and clear-cut, it nevertheless aids in appellants' attempt to connect the deafness to the accident. The jury was deprived of an expert opinion that the deafness could have been caused by the accident and that it could have come on after the lapse of time involved. The testimony also forecloses flying as the cause of Mr. Butler's problem. The doctor's testimony, coupled with the evidence that prior to the accident the plaintiff's hearing was good, is sufficient to allow the testimony to be submitted to the trier of fact. *Mabrier v. A. M. Servicing Corporation of Raytown*, 161 N.W.2d 180 (Iowa 1968); *Schneider v. Swaney Motor Car Co.*, 257 Iowa 1177, 136 N.W.2d 338 (1965); *Ficken v. Hopkins*, 389 S.W.2d 193 (Mo.1965); *Comeau v. Beck*, 319 Mass. 17, 64 N.E.2d 436 (1946); *Hanlon v. Gulf Refining Co., et al.*, 115 Pa.Super. 315, 175 A. 724 (1934). We conclude that the appellants were prejudiced by not being permitted to bring the expert testimony before the jury.

Reversed.

HOWARD, C. J., concurring.

WREN, Judge, dissenting.

I must respectfully disagree. The dispute in this case concerns whether there was sufficient testimony or evidence of a causal relationship between plaintiff's automobile accident and his subsequent loss of hearing to supplement, and thereby justify, the admission of Dr. Bernstein's testimony that it was "possible" that the accident and the hearing loss were related. In my opinion, there was not.

Mr. Butler's loss of hearing occurred several months after his accident and immediately after a flight in a private airplane. The fact that Dr. Bernstein excluded plaintiff's airplane ride as an alternative cause of his injury is not sufficient, in my opinion, to constitute additional evidence of a causal relationship between the accident and the injury. This is not a case such as *Ideal Food Products Co. v. Rupe*, 76 Ariz. 175, 261 P.2d 992 (1953), wherein the injury could *only* be caused by trauma or injury. In the present action the doctor stated that nerve damage to the ear, such as that from which the plaintiff suffers, could be caused by a variety of factors and that the specific factor could seldom be ascertained in any particular case.

The plaintiff's own testimony that the whiplash he suffered in the accident caused his deafness could have no probative value whatsoever. As noted by Dr. Bernstein, such a statement by a patient immediately after an accident might be probative. However, when made months after the accident, as here, I submit that its evidentiary value as to causation is completely lost, and the question obviously becomes one exclusively within the realm of medical expertise.

Given the length of time between the accident and the time plaintiff's deafness manifested itself, and the lack of competent evidence indicating a relationship between the two events, I feel the trial court acted wholly within its discretion in excluding Dr. Bernstein's deposition. "Such gossamer speculation is the stuff from which dreams are made and not the foundation stone for an action in negligence. *Palsgraf v. Long Island R. Co.*, 248 N.Y. 339, 162 N.E. 99, 59 A.L.R. 1253 [1928]." *Morris v. Ortiz*, 103 Ariz. 119, 121, 437 P.2d 652, 654 (1968).

I would affirm.