Billy Lee SOUTH and Delores South, husband and wife, Plaintiffs and Appellees,

v.

NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK), Burlington Northern Railroad, Inc., Leslie Roy Strom and S. M. Burdick as Public Special Administrator of the Estate of Howard W. Decker, Deceased, Defendants and Appellants.

Civ. No. 9664.

Supreme Court of North Dakota.

March 20, 1980.

Davies, Pearson, Anderson, Seinfeld, Gadbow, Hayes & Johnson, Tacoma, Wash., and Ralph S. Oliver, Larimore, for plaintiffs and appellees; appearances by Ralph S. Oliver, Larimore, Alvin A. Anderson, and Edward S. Winskill, argued by Alvin A. Anderson and Edward S. Winskill, Tacoma, Wash.

Nilles, Hansen, Selbo, Magill & Davies, Fargo, for defendants and appellants; argued by Frank J. Magill, Fargo.

PAULSON, Justice.

This is an appeal by the defendants, National Railroad Passenger Corporation (AMTRAK), Burlington Northern Railroad, Inc., Leslie Roy Strom, and S. M. Burdick as Public Special Administrator of the estate of Howard W. Decker, deceased [herein collectively referred to as the "Railroad"], from the judgment of the Grand Forks District Court, entered March 21, 1978, and amended May 12, 1978, in which the court, upon jury verdicts, awarded the plaintiff Billy Lee South [herein referred to as "South"] $948,552, including costs, and awarded the plaintiff Delores South $126,000, including costs. The Railroad also appeals from the order of the district court,

entered May 16, 1979, in which the court denied its motion for judgment notwithstanding the verdict or in the alternative for a new trial. We affirm.

An action was commenced by South for damages sustained as a result of a collision between a pickup truck, owned and driven by South, and the Railroad's train at the Barrett Avenue crossing in Larimore, North Dakota, on January 17, 1976, at approximately 6:20 a. m. South sustained serious injuries in the collision. He sued the Railroad for damages on a theory of negligence, and his wife, Delores, also sued the Railroad for damages allegedly incurred by the loss of her husband's consortium.

Although pertinent facts will be detailed as each issue is discussed, a brief recitation of the facts at this point should be helpful in acquiring an understanding of the issues.

Prior to the collision South was employed as a missile site superintendent. South lived in Larimore, and on the morning of the collision he, for the first time, was driving to work at a new missile site location to which he had been assigned. To drive to the old work site South crossed the railroad tracks in Larimore at the Towner Avenue crossing, but in order to drive to the new work site South took a route which crossed the tracks at the Barrett Avenue crossing.

As South approached the Barrett Avenue crossing traveling south at approximately 20 miles per hour, a westbound AMTRAK passenger train was also approaching the Barrett Avenue crossing traveling at approximately 68 miles per hour. Both the train and South's pickup reached the crossing at approximately the same instant and the front of the train engine collided with the left front portion of South's vehicle.

The parties do not dispute that as one approaches the Barrett Avenue crossing traveling south his view of the tracks to the east is obstructed. The parties do dispute, however, the extent of the obstruction and the part such obstructed view played in the

collision between South's pickup and the train. South's expert witnesses testified that under the conditions existing at the time of the collision it was impossible for South to see the train in time to stop before reaching the railroad tracks. South asserts that the train whistle did not blow a warning of the train's approach to the Barrett Avenue crossing, and several witnesses testified on South's behalf that although they were in a position to hear the train whistle at the Barrett Avenue crossing that morning they did not hear the whistle blow. South also introduced evidence to support his assertion that the railroad negligently maintained the crossbuck sign at the Barrett Avenue crossing.

The Railroad asserts that it was not negligent in the operation of its train and that the maintenance of the crossbuck sign was not a material issue because South was aware of the location of the railroad tracks running through Larimore. Several witnesses testified, on behalf of the Railroad, that the train whistle did blow a warning on the morning of the collision. The Railroad also attempted to prove that South was negligent in failing to ascertain the presence of the train and in failing to safely stop his vehicle prior to reaching the railroad tracks.

At the conclusion of the trial the jury returned a verdict in favor of South and his wife, Delores, against the Railroad. The jury, upon finding that the Railroad was 100 percent negligent and that South was not negligent, awarded general and special damages of $935,000 to South and $125,000 to Delores South.[1]

The Railroad has raised numerous issues on appeal, each of which we shall discuss in this opinion.

JURY INSTRUCTIONS—CITY'S NEGLIGENCE

The Railroad asserts that the trial court committed reversible error when it

1. In addition to the damages awarded by the jury the judgment of the court included an award of costs and disbursements in the amount of $13,552 to South and of $1,000 to Delores South.

refused to instruct the jury to consider the negligence of the city of Larimore for the purpose of apportioning negligence.

Upon initiating their lawsuit, the Souths joined the city of Larimore as a party defendant, alleging that the city negligently failed to sand Barrett Avenue and negligently failed to provide adequate advance warning signs. Prior to trial the city moved to dismiss the action against it, and the trial court granted the motion on the grounds that the allegations against the city involved discretionary governmental functions for which no action could be maintained and that the city had no affirmative duty to provide advance warning signs at the railroad crossing. The Souths filed a notice of appeal from the order dismissing the city as a party defendant but failed to submit timely briefs, and, as a result, this court dismissed the appeal. *See, South v. National Railroad Passenger Corp., (AMTRAK),* 260 N.W.2d 212 (N.D.1977). The Railroad did not file a cross-claim or a third-party claim against the city nor otherwise attempt to make the city a party to the proceedings.

Under the circumstances of this case the failure of the trial court to instruct the jury to consider the negligence of the city of Larimore, if such failure to instruct was error, was not prejudicial to the Railroad for reasons we shall explain herein. Therefore, we believe that it is both unnecessary and improvident to decide the issue of whether or not a jury should be instructed to consider the negligence of non-parties for apportionment purposes. The significance that a determination of this issue would have on damage awards in future personal injury cases necessitates that such determination be made in a case where the issues are more fully briefed and argued and where the determination of the issue would have an actual effect on the outcome of the case.

The failure to instruct the jury to consider the negligence of the city of Larimore,

if error, is harmless and nonprejudicial to the Railroad because of the following three interrelated factors:

(1) The jury determined that the plaintiff South was not negligent;

(2) The jury determined that the Railroad was negligent and that such negligence was a proximate cause of the damages sustained by South; and

(3) Section 9–10–07, N.D.C.C., provides that when two or more persons are jointly liable "each shall remain jointly and severally liable for the whole award."

Consideration by the jury of the negligence of the city of Larimore could not have changed its determination that South was not negligent nor its determination that the Railroad was negligent. Therefore, pursuant to § 9–10–07, N.D.C.C., the Railroad is liable to the plaintiff for the whole award irrespective of any apportionment of negligence the jury may have made between the Railroad and the city of Larimore. Furthermore, such apportionment would have had no binding effect on the city of Larimore for contribution purposes because the city was not a party to the lawsuit.[2]

We hold that the trial court's failure to instruct the jury to consider the negligence of the city of Larimore did not constitute prejudicial error.

## JURY INSTRUCTIONS—DUTY

The Railroad asserts that the trial court improperly and inadequately instructed the jury on the legal duties of a railroad and of a motor vehicle driver with regard to railroad crossings. The Railroad lists sixteen proposed instructions which the trial court refused to submit to the jury and asserts that the court committed prejudicial error by its refusal to submit them.

On review, jury instructions must be considered as a whole, and if, when so considered, they correctly advise the jury as to the law they are sufficient although

---

**2.** For the resolution of this issue we make no decision as to whether or not the Railroad can now maintain a separate action against the city of Larimore for contribution under Chapter 32–38, N.D.C.C.

parts of them standing alone may be erroneous or insufficient. *State v. Unterseher,* 255 N.W.2d 882 (N.D.1977). The trial court's refusal to give requested instructions is not reversible error when the instructions that are given fairly and adequately apprise the jury of the law. *See, Wasem v. Laskowski,* 274 N.W.2d 219 (N.D. 1979); *Eriksen v. Boyer,* 225 N.W.2d 66 (N.D.1974).

We have reviewed the instructions submitted to the jury as well as the Railroad's proposed instructions which were refused by the trial court. We conclude that the submitted instructions fairly and adequately apprised the jury of the legal duties of the parties. Accordingly, the court did not commit error by its refusal to submit the Railroad's proposed instructions.

The Railroad also asserts, and more specifically, that the trial court erred when it submitted the following instruction to the jury:

### "RAILROADS TO MAINTAIN SAFE CROSSINGS

"You are instructed that at the time of this accident and since 1890 the laws of the State of North Dakota provided:

" 'All railroad corporations operating a line of railway in this state shall build or cause to be built and kept in repair, safe and sufficient crossings over such line at all points where it shall intersect any public highway in use.' "

The above instruction quotes § 49–11–05, N.D.C.C. The Railroad asserts that the instruction is misleading because the court did not also submit the language of § 49–11–06, N.D.C.C., which, according to the Railroad, delineates the specific duties of proper construction to which § 49–11–05, N.D.C.C., relates. The Railroad contends that the instruction, as submitted to the jury, could have misled the jury to infer

that the Railroad had a duty to close or modify the Barrett Avenue crossing to make it safer.

During 1979, the Legislature amended § 49–11–05, N.D.C.C., (1979 S.L., Ch. 501, § 9), to provide, in relevant part:

"*49–11–05. Railroad to maintain sufficient highway crossings.* All railroad corporations operating a line of railway in this state shall build or cause to be built and kept in repair safe and sufficient crossings in accordance with section 49–11–06 over the railway line at all points where it intersects any public highway in use."

Prior to the 1979 amendment the duties of the Railroad under § 49–11–05, N.D.C.C., did not expressly relate to and were not necessarily confined to the requirements of § 49–11–06, N.D.C.C.[3] The railroad crossing accident involved in this case occurred during 1976 prior to the effective date of the 1979 amendment to § 49–11–05, N.D. C.C. We conclude that the trial court did not err by submitting the instruction on the provisions of § 49–11–05, N.D.C.C., without also submitting an instruction on the provisions of § 49–11–06, N.D.C.C. Furthermore, any possible misleading effect caused by the submitted instruction was vitiated by the following instruction which was also submitted to the jury by the trial court:

### "ADDITIONAL CROSSING PROTECTION

"You are instructed that the Court finds as a matter of law that the mere fact that Barrett Street intersects the railroad does not raise any duty whatsoever on the part of the railroad or any of the defendants to take upon themselves the responsibility for installing flagmen, gates, electric or automatic crossing signals, stop signs, advance railroad warning signs, modification of the crossing in any manner, or closure thereof.

---

**3.** Prior to the 1979 amendment § 49–11–05, N.D.C.C., provided, in relevant part:

"*49–11–05. Railroad to maintain sufficient highway crossings.*—All railroad corporations operating a line of railway in this

state shall build or cause to be built and kept in repair safe and sufficient crossings over such line at all points where it shall intersect any public highway in use."

"You are instructed that the Court finds as a matter of law that, with the exception of the obligation upon the railroad to install and maintain crossbucks, only the Public Service Commission of the State of North Dakota can find a crossing extra hazardous or unusually dangerous to life and property requiring additional protection beyond the crossbuck.

"You are further instructed that there are no such statutes, regulations or law in North Dakota imposing any such legal requirements upon any of the defendants.

"Therefore, you may not find that there exists any duty on the part of any of the defendants to place any additional warning devices such as described above or any duty to close or otherwise modify the Barrett Street Crossing on behalf of any of the defendants, other than the obligation concerning the crossbuck covered in another instruction. Further, you may not find any of the defendants negligent by reason of the absence of any of the above devices or upon the failure of the railroad to close the crossing or modify it in any manner."

## JURY INSTRUCTIONS—INCOME TAX

█ The Railroad asserts that the trial court erred when it refused to instruct the jury that any damages awarded to South would not be taxable to him as income.

This issue was resolved by our Court in *Eriksen v. Boyer*, 225 N.W.2d 66 (N.D.1974), wherein this Court stated:

"We adhere to the majority rule that it is improper to instruct the jury that an award of damages is not subject to income tax and that such tax should not be considered in fixing the amount of damages. *Briggs v. Chicago Great Western Ry. Co.*, 248 Minn. 418, 80 N.W.2d 625 (1957), and cases cited at Note 21. We agree with the statement of the Illinois Supreme Court in *Hall v. Chicago & North Western Ry. Co.*, 5 Ill.2d 135, 151, 125 N.E.2d 77, 86 (1955):

" 'It is a general principle of law that in the trial of a lawsuit the status of the parties is immaterial. Thus, what the plaintiff does with an award, or how the defendant acquires the money with which to pay the award, is of no concern to the court or jury. Similarly, whether the plaintiff has to pay a tax on the award is a matter that concerns only the plaintiff and the government. The tortfeasor has no interest in such question. And if the jury were to mitigate the damages of the plaintiff by reason of the income tax exemption accorded him, then the very Congressional intent of the income tax law to give an injured party a tax benefit would be nullified.

.          .          .          .          .

" 'We are of the opinion that the incident of taxation is not a proper factor for a jury's consideration, imparted either by oral argument or written instruction. It introduces an extraneous subject, giving rise to conjecture and speculation.'

"To this we would only add that the incidence of income tax is no more relevant to the amount of the award ultimately available to the plaintiff than the amount of his contingent attorney fees, if any. If one is to be the subject of a jury instruction, so should the other. We hold that neither is an appropriate subject for jury instruction." 225 N.W.2d at 73–74.

During February of this year, the United States Supreme Court held in *Norfolk and Western Railway Co. v. Liepelt*, —— U.S. ——, 100 S.Ct. 755, 62 L.Ed.2d 689 (1980), that it was reversible error to refuse to submit a jury instruction that "your award will not be subject to any income taxes, and you should not consider such taxes in fixing the amount of your award." The *Liepelt* decision was entered subsequent to the trial in the instant case, and there is no indication by the Court that *Liepelt* is to be given retroactive application. Furthermore, the action in *Liepelt* was commenced under the Federal Employer's Liability Act, and the Court expressly determined that the case was governed, therefore, by federal law. The decision in *Liepelt* was not based upon constitutional grounds, and we make no decision as to whether or not that decision

should be followed in future cases governed by state law.

We adhere to the rationale of our decision in *Eriksen*, and we hold that the trial court did not err when it refused to instruct the jury on the non-taxability of a damage award.

## STOPWATCH ALLOWED IN JURY ROOM

The Railroad asserts that the trial court erred when it permitted the jury to take a stopwatch into the jury room during deliberations. The stopwatch was offered into evidence as an exhibit by the Souths' counsel during his direct examination of an expert witness who was testifying with respect to reaction and braking time. When the Souths' counsel offered the stopwatch into evidence, the Railroad's counsel objected to the lack of foundation. The Souths' counsel then proceeded to lay foundation by questioning the witness as to whether he had used that particular stopwatch to measure elapsed time. The witness responded affirmatively and then the following exchange occurred:

> "[Railroad's counsel]: Now counsel, if you have him testify it's accurate, we'll waive all objections.
>
> "[The Souths' counsel]: We've checked the accuracy of it against our watches.
>
> "[Railroad's counsel]: Okay, I withdraw my objection on that basis.
>
> "THE COURT: Very well. The Exhibit will be received. May I see it, please?"

Thus, the stopwatch was admitted as an evidentiary exhibit without objection by the Railroad. In fact, the Railroad expressly waived all objections to admission of the stopwatch as an exhibit. At the close of the trial the Railroad objected, without success, to allowing the stopwatch into the jury room. The Railroad asserts that the jury may have improperly used the stopwatch to conduct its own investigation of the facts, and it cites the case of *King v. Railway Express Agency, Inc.*, 94 N.W.2d 657 (N.D. 1959), as supporting its right for a new trial because of this error.

In *King* this Court affirmed the trial court's grant of a new trial on the ground that the trial court had improperly permitted the jury to have a ruler and a piece of string for experimentation during the course of its deliberations without the knowledge or consent of the parties. In *King*, the plaintiff was injured when he fell from a ladder while splicing an electric wire which was hanging above the street. The fall occurred when the defendant drove his truck under the electric wire causing the truck visor to catch the wire and pull the plaintiff from the ladder. One of the jurors stated by affidavit that the jury used the string and ruler to "visualize in a general way how the wire would have sagged." In affirming the trial court's order for a new trial this Court stated:

> "There is no provision in the law that permits giving to the jurors any instruments or articles that have not been admitted as exhibits or used as instruments in explaining exhibits and as to the latter instruments they can only be allowed to the jury with the consent of counsel." *King, supra* 94 N.W.2d at 660.

The important distinction between the *King* case and the instant case is that the articles given to the jury for experimentation in *King* were neither properly admitted exhibits nor approved for jury experimentation by consent of the parties, whereas, in the instant case, the stopwatch was an exhibit admitted into evidence without objection by the Railroad. We hold that the trial court did not err when it permitted the jury to take the stopwatch exhibit into the jury room.

## TESTIMONY—PRIOR OCCASIONS OF NEAR ACCIDENTS

Three witnesses testified at the trial as to prior instances in which the testifying witness nearly collided with a train at the Barrett Avenue crossing. The Souths were allowed to introduce this "near accident" testimony to demonstrate the dangerous character of the Barrett Avenue crossing. The Railroad asserts that the trial court erred in admitting this testimony because

the circumstances involving the prior "near accidents" were not substantially similar to those of the South accident, and, therefore, such testimony "served only to confuse the jury and divert the jury's attention from the accident in question."

The case decisions reflect a majority view that testimony of prior accidents is admissible to show, among certain other things, that a dangerous situation or condition exists, providing that the facts of the prior accidents are substantially similar to those of the accident involved in the lawsuit. *Stoler v. Penn Central Transp. Co.,* 583 F.2d 896 (6th Cir. 1978); *Young v. Wlazik,* 262 N.W.2d 300 (Minn.1977); *Churchill v. Norfolk & Western Railroad Co.,* 46 Ill.App.3d 781, 5 Ill.Dec. 885, 362 N.E.2d 356 (Ill.App. Ct.1977), *aff'd,* 73 Ill.2d 127, 23 Ill.Dec. 58, 383 N.E.2d 929 (Ill.1978); *St. Louis Southwestern Railway Co. v. Jackson, Admr.,* 242 Ark. 858, 416 S.W.2d 273 (1967); *Freed v. Simon,* 370 Mich. 473, 122 N.W.2d 813 (1963); *Annot.,* 70 A.L.R.2d 167 (1960). This majority view has been extended to include admission of prior "near accidents." *O'Dell v. Chicago, Milwaukee, St. Paul & Pacific Railroad Co.,* 6 Wash.App. 817, 496 P.2d 519 (1972); *Berk v. Arendts,* 254 Iowa 363, 117 N.W.2d 905 (1962); *Plumb v. Minneapolis and St. Louis Railway Co.,* 249 Iowa 1187, 91 N.W.2d 380 (1958).

■ We follow the view that evidence of prior accidents or prior "near accidents" is admissible providing that the circumstances of the prior accidents or "near accidents" are substantially similar to those of the accident involved in the lawsuit.

■ We have carefully reviewed the "near accident" testimony admitted into evidence by the trial court. Although there are some circumstances with regard to each incident that are different from those existing during the South accident, we conclude that in each case the facts were sufficiently similar that we cannot conclude that the trial court abused its discretion by admitting such evidence. The differences in the circumstances between such incidents and the South accident were matters which affect the weight of the evidence, not its admissibility. *E. g., Young v. Wlazik,* 262 N.W.2d 300, 310 (Minn.1977).

## TESTIMONY—HABIT OF FAILURE TO BLOW TRAIN WHISTLE

The trial court allowed plaintiff to introduce evidence that on prior occasions the train's whistle was not blown at the Barrett Avenue crossing. This evidence was offered to show that the Railroad had a "habit" of not blowing a warning whistle at that crossing for the purpose of proving circumstantially that the train whistle was not blown prior to the collision between the Railroad's train and South's vehicle. The Railroad asserts that the trial court erred when it admitted such evidence because the testimony merely consisted of a few isolated instances of conduct which did not constitute a habit admissible under Rule 406, NDREv.

■ Rule 406, NDREv, provides:

"*Rule 406. Habit: Routine Practice.*

"Admissibility. Evidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice."

Prior to the adoption of Rule 406, NDREv, this Court provided the following definition of "habit" in *Glatt v. Feist,* 156 N.W.2d 819 (N.D.1968), which remains viable under Rule 406, NDREv:

"Where such evidence of habit is offered on the issue of negligence, it must be limited to conduct which constitutes a person's regular practice of meeting a particular situation with specific conduct, thus showing that the doing of such act and the conduct of the person in meeting a certain situation were practically automatic." 156 N.W.2d at 828.

With respect to this issue James Morten, a resident of Larimore, testified as follows:

"Q. Mr. Morten, repeating the question to you, during the period of 1975 and in 1976, up until the time of the

accident, will you tell the jury, if you know, what you observed as to whether or not the Empire Builder or the Amtrak train No. 7 going through at six in the morning blew its whistle on a regular basis or not?

"A. Well, I have observed it blowing its whistle approaching the track and I've seen it come across when I didn't hear a whistle. I couldn't put a whistle to that train.

"Q. And how many times did that occur?

"A. It would be a number of times but I couldn't put a number on it because I so frequently seen it."

Ellen Olson, also a resident of Larimore, testified as follows:

"Q. You may answer the question. You may testify how often they blew the whistle and how often they didn't blow the whistle.

"A. They blow from the east crossing but when they come right in front of my window they are supposed to blow for the west side. But a lot of times they missed that, I know that."

We conclude that the trial court did not abuse its discretion when it admitted the foregoing testimony under Rule 406, NDREv, as evidence that the Railroad had a habit of failure to blow a warning whistle at the Barrett Avenue crossing. The testimony, with respect to the Railroad's failure to blow a warning whistle, that "I so frequently seen it" and that "a lot of times they missed that" is a sufficient basis upon which the trial court, in its discretion, could admit the evidence under Rule 406, NDREv.

## NEGATIVE WHISTLE TESTIMONY

The Railroad asserts that the trial court erred when it allowed the Souths' witnesses to testify that they did not hear the train whistle blow as the train approached the Barrett Avenue crossing on the morning of South's accident. The Railroad contends that there was insufficient foundation for such testimony because there was no show-ing that the witnesses were in a position to hear the whistle or that they were listening for the whistle. We disagree with the Railroad's contention that there was insufficient foundation for admission of this testimony.

■ In *Alires v. Southern Pacific Co.*, 100 Ariz. 6, 409 P.2d 714 (1966), the Arizona Supreme Court held that testimony by witnesses that they did not hear the train's bell or whistle was relevant evidence sufficient to support a jury finding that the train did not sound its bell or whistle. In so holding the court stated:

"The defendants claim that this negative testimony—not hearing a whistle or a bell—had no evidentiary value.

"Such testimony, when it is coupled with a sufficient predicate, consisting of additional testimony or circumstances, to show that the witness' position and attitude of attention was such that he would probably have heard or seen the occurrence of the event had it happened, is relevant and will support a finding." 409 P.2d at 719.

We agree with the Arizona Supreme Court that negative testimony (i. e. testimony that a particular act or event did not occur) is admissible to prove the non-occurrence of such act or event providing that the testifying witness was so situated that he would have probably been aware of the event had it occurred.

■ We have reviewed the testimony of the Souths' witnesses Doreen Bakke, Greg Sampson, Leonard Peterson, Ellen Olson, and of the plaintiff, Billy South, all of whom testified that they did not hear the train whistle blow as the train approached the Barrett Avenue crossing prior to the collision between the train and South's vehicle. We conclude that with respect to each witness there is sufficient foundation that the witness was in a position to have heard the train whistle if it had been blown. Accordingly, we hold that the trial court did not err when it admitted such testimony.

## EXPERT TESTIMONY

As its next issue, the Railroad asserts as follows:

"The Railroad was denied a fair trial by expert testimony on lay matters of common knowledge, causation, accident inevitability, opinions and testimony on matters not in issue, and legal conclusions."

More specifically, the Railroad contends that the testimony of the Souths' witnesses, DeWitt Whitman and Gerald Cysewski, involved matters of common knowledge to lay persons which were improper matters on which to solicit expert opinion. The Railroad also asserts that it was improper to allow these expert witnesses to contradict South's testimony because South should not be allowed to introduce testimony more favorable to himself than his own testimony.

Rule 702, NDREv, which governs the admission of expert testimony, states:

"*RULE 702. Testimony By Experts*

"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

■ The test for admission of expert testimony under Rule 702, NDREv, is whether or not such testimony will assist the trier of fact to understand the evidence or to determine a fact in issue and whether or not the witness is qualified as an expert. The determination to admit or not admit expert testimony under Rule 702, NDREv, rests within the sound discretion of the trial court, and its determination will not be reversed on appeal unless the court has abused its discretion. *Olson v. A.W. Chesterton Co.,* 256 N.W.2d 530 (N.D.1977); *Stein v. Ohlhauser,* 211 N.W.2d 737 (N.D. 1973).

Whitman testified that he retired as a major from the Washington State Patrol after 32 years of service. He also testified that he had specialized in accident reconstruction and that he had conducted over 5,000 test skids to determine coefficients of friction on various surface conditions.

■ With respect to South's accident, Whitman testified as to the coefficient of friction; the perception, reaction, and braking times for South to stop his vehicle; and the minimum distance South's vehicle would have traveled under the circumstances. We conclude that the trial court did not abuse its discretion by admitting Whitman's testimony to assist the jury in its determinations of the proximate cause of the collision and whether or not South was negligent. Coefficients of friction, braking distances, and perception, reaction, and braking times are not matters within the common knowledge of lay persons, and the trial court properly allowed expert testimony to assist the jury in its understanding of these important concepts.

Gerald Cysewski also testified as an expert witness for the Souths. Cysewski, a civil engineer, testified that he was the director of traffic and transportation planning with an "architect-engineering planning firm" in Seattle, Washington. Cysewski received a scholarship to and graduated from Yale University Graduate School in Highway Traffic. He testified that while attending Yale he studied "highway traffic, driver reaction, highway design, feasibility analysis, signing, signals, pavement markings, interchange design" and that he researched driver behavior and automobiles through lapse time photography including research of driver reaction times.

■ With respect to South's accident, Cysewski was allowed to testify on the following matters over the railroad's objection:

(1) General standards of construction and design of highways and traffic control devices;

(2) Various aspects of the Barrett Avenue crossing which rendered the crossing extrahazardous or dangerous;

(3) Perception reaction times and effects of the coefficient of friction on stopping time and distance.

We conclude that the trial court did not abuse its discretion by admitting Cysewski's expert testimony under Rule 702, NDREv. The matters about which Cysewski testified are of the type which the trial court could allow expert opinion to assist the jury in its determination of the issues. *See Koch v. Southern Pacific Co.*, 266 Or. 335, 513 P.2d 770 (1973); *Merchants Nat. Bank of Aurora v. Elgin, Joliet & Eastern Railway Co.*, 49 Ill.2d 118, 273 N.E.2d 809 (1971); *Southern Pacific Co. v. Watkins*, 83 Nev. 471, 435 P.2d 498 (1967); *Bridger v. Union Railway Co.*, 355 F.2d 382 (6th Cir. 1966); *Boston and Maine Railroad v. Talbert*, 360 F.2d 286 (1st Cir. 1966).

The *Talbert* case involved an action to recover damages for injuries to and the death of plaintiff's husband as a result of a collision between defendant's train and a truck. Judgment was entered upon a jury verdict for the plaintiff and, on appeal, the defendant claimed reversible error in the admission of evidence of certain nationally recognized standards concerning the design of highway and railroad crossings. The First Circuit Court of Appeals, in holding that such evidence was admissible, stated:

"In admitting this evidence, the trial court noted that it was not completely authoritative and it was for the jury's consideration like any other evidence in the case. In its charge, the trial court also correctly instructed the jury on the standard of care to be applied. In our opinion these nationally recognized standards were properly admissible as one more piece of evidence upon which the jury could decide whether the defendant acted as a reasonably prudent person in the circumstances of this case." *Talbert, supra* 360 F.2d at 290.

In the instant case the trial court allowed Cysewski to testify regarding standards of construction and design of highway and traffic devices similar to the evidence admitted in *Talbert*. In the instant case, as in *Talbert*, the trial court properly instructed the jury on the law and the standard of care to be applied, and this evidence of generally recognized standards was properly admissible to assist the jury in determining whether the Railroad had acted negligently under the existing circumstances.

Cysewski also testified concerning various aspects of the Barrett Avenue crossing which, in his opinion, rendered the crossing dangerous and extrahazardous. A number of courts have held that similar testimony was admissible and did not invade the province of the jury or otherwise prejudice the opposing party. *Koch v. Southern Pacific Co.*, 266 Or. 335, 513 P.2d 770 (1973); *Merchants Nat. Bank of Aurora v. Elgin, Joliet & Eastern Railway Co.*, 49 Ill.2d 118, 273 N.E.2d 809 (1971); *Southern Pacific Co. v. Watkins*, 83 Nev. 471, 435 P.2d 498 (1967); *Bridger v. Union Railway Co.*, 355 F.2d 382 (6th Cir. 1966). In this regard the Supreme Court of Oregon in *Koch* stated:

"The factor which determines if a subject is a proper one for expert testimony is whether the answer of an expert can be of appreciable help to the jury. *Sandow v. Weyerhaeuser Co.*, 252 Or. 377, 380, 449 P.2d 426 (1969). It depends upon whether the subject is such that the expertise of the witness gives him a special insight superior to that of the average juror. There is no doubt that the experts who testified in the present case had superior knowledge and training concerning railroad crossings and those circumstances which make them dangerous. Thus, it was appropriate for the experts to point out to the jury, as they did, the aspects of the crossing which increased its danger to vehicular traffic and the steps that could have been taken by the railroad to alleviate such danger." *Koch, supra* 513 P.2d at 773.

A contrary position was taken by the Arkansas Supreme Court in *St. Louis Southwestern Railway Co. v. Jackson*, 242 Ark. 858, 416 S.W.2d 273 (1967), wherein the court held that it was reversible error to admit expert opinion that a railroad crossing was abnormally dangerous. In *Jackson*, fifteen facts were submitted to an expert witness upon which he based his conclusion that the railroad crossing in question was abnormally dangerous. The Arkansas Supreme Court concluded that each and every

submitted fact was within the comprehension of the average juror and that the jurors could draw their own conclusions as to whether or not the crossing was abnormally dangerous.

We follow the rationale of those courts which have held that expert testimony on the dangerous nature of a railroad crossing is admissible, and we hold that the trial court did not abuse its discretion in admitting Cysewski's testimony on this matter.

Cysewski also testified with regard to such matters as perception and reaction times and the effect of the coefficient of friction on stopping time and distance. In our discussion of Whitman's testimony we concluded that the trial court did not abuse its discretion in admitting such expert testimony, and we likewise hold that the trial court did not err in allowing Cysewski to testify on these matters.

The Railroad also asserts that it was error for the trial court to allow the Souths' expert witnesses to give opinions which were more favorable to the Souths than Billy South's own testimony. The Souths' expert witnesses testified that it would have been impossible for South to stop his vehicle prior to reaching the railroad track. South testified, however, that at 20 m.p.h. he could have stopped his vehicle within twice its length or approximately 18 feet and 1 inch. The Railroad asserts that South is bound by his testimony and that it was impermissible to allow him to introduce expert testimony which contradicted his own testimony. In support of its position the Railroad quotes from the case of *Verry v. Murphy,* 163 N.W.2d 721 (N.D.1968), in which this Court stated:

"   .   .   .   a party cannot claim the benefit of a version of relevant facts more

favorable to him than he has made for himself by his own testimony." 163 N.W.2d at 735.[4]

■ The courts are in disagreement as to the extent, if at all, that a party is bound by his own testimony. *See, McCormick on Evidence,* § 266 (2d ed. 1972) (and cases cited therein). However, there is a well recognized rule, which was not applicable in the *Verry* case, that a party is not bound by his own testimony on matters which constitute an estimate or an opinion. *Coldiron v. Mattick,* 488 S.W.2d 362 (Ky.1972); *Vaeth v. Gegg,* 486 S.W.2d 625 (Mo.1972); *Starks v. City of Houston,* 448 S.W.2d 698 (Tex.Civ. App.1969); *Hanson v. Darby,* 100 Ill.App.2d 339, 241 N.E.2d 110 (1968); *Hilburn v. Brodhead,* 79 N.M. 460, 444 P.2d 971 (1968); *Saunders v. Bulluck,* 208 Va. 551, 159 S.E.2d 820 (1968). We believe the foregoing rule is well reasoned, and, therefore, we shall apply that rule to the situation in the instant case.[5]

■ During the trial South had a right to testify and to express his opinion on the distance within which he could have stopped his vehicle on the morning of the accident. However, South's stopping distance testimony constitutes a mere opinion on a matter, the technical aspects of which are not generally within the common knowledge of lay persons. Accordingly, we hold that South was not bound by his testimony that he could stop his vehicle within twice its length. We further hold that the trial court properly allowed South to introduce expert opinion testimony as to the time and distance within which South could have stopped his vehicle.

4. *See also, Malarchick v. Pierce,* 264 N.W.2d 478 (N.D.1978), wherein this Court determined that a party's testimony was sufficiently deliberate, clear, and unequivocal to operate as a judicial admission.

5. The North Dakota Rules of Evidence were adopted by this Court in December 1976, effective February 15, 1977, subsequent to the *Verry* decision. Although not necessarily dispositive of this issue, Rule 607, NDREv, reflects the view that a party should not be forced to·vouch for his own witnesses, but rather that he may contradict or otherwise attack the credibility of any witness. We believe that it is consistent with this view expressed in Rule 607, NDREv, to allow a party to contradict his own opinion testimony. Although a party may have a persuasion problem when he attempts to contradict his own words, the resolution of a disputed fact should rest with the trier of fact based upon all available relevant evidence.

## EXPERT TESTIMONY—PHOTOGRAPHER

The trial court refused to allow the Railroad's photographic expert, John Vickers, to give his opinion on the accuracy of various photographs of the Barrett Avenue crossing which had been admitted as exhibits during the trial. The Railroad contends that the trial court erred in refusing to allow such testimony.

The photographs showed the Barrett Avenue crossing with the old crossbuck sign which was in place at the time the accident occurred. Subsequent to the taking of the photographs, the crossbuck sign was removed from the crossing, at the Souths' request, to be used as an exhibit at the trial. A new crossbuck sign, which contained highly reflectorized material, was then placed at the Barrett Avenue crossing. Vickers viewed the scene at the Barrett Avenue crossing after the old sign was removed and the new sign placed in position.

Upon ruling that Vickers would not be allowed to give his opinion on the accuracy of the photographs the trial court explained its reasoning, part of which was as follows:

"Now it's true that we're not talking about the introduction of anything other than reflective light but since the material—the question involved is what could a person see in the location of the crossing. It seems to me to be more than can be expected of a witness to be able to blot out of his vision the reflection of a highly reflective sign, a new sign in the very location that he would be concerned about based on the whole sign, and so I believe that there would be a substantive difference in what a person could see has nothing to do with the credibility of the witness or his forthrightness of his answer. But I do believe there would be a necessary change in what he would see. In fact, he would very likely see less.

"[Railroad's counsel]: Isn't that a matter of cross-examination rather than foundation?

"THE COURT: The only problem with that is to get into the post accident change problem and the only way it can

be offered is to refer to the signs. I don't know that you want to get into all that." The trial court obviously determined that because Vickers' view of the scene had occurred when a new, highly reflectorized crossbuck sign was in place, his testimony would not be relevant as to the accuracy of photographs showing the old crossbuck sign still in place. The trial court was also concerned, that, in order to adequately explain to the jury the difference in the scene at the time the photographs were taken and the time when Vickers had viewed the scene, it would be necessary to admit impermissible evidence of the post-accident change of crossbuck signs.

The determination to admit or not admit Vickers' expert testimony rests within the sound discretion of the trial court. We hold that under the circumstances presented to the trial court it did not abuse its discretion in refusing to admit Vickers' testimony.

## PREJUDICIAL CONDUCT OF COUNSEL

The Railroad asserts that the Souths' counsel committed a number of improper acts during the trial which resulted in reversible error entitling the Railroad to a new trial.

### (a) Alcohol Incident

During opening argument the Souths' counsel stated that Gregory Sampson, an investigating officer, would testify to the effect that railroad employees on the train had been drinking. In a signed statement, Sampson stated that he had smelled alcohol at the scene of the accident, but that he could not state who, if anyone, had been drinking. The Railroad brought this matter to the court's attention in chambers after opening argument. After a lengthy consideration of the issue the court ordered the Souths' counsel to retract his statement before the jury. In open court the Railroad's counsel acquiesced in the statement of retraction made to the jury by the Souths' counsel. Any prejudice to the Railroad's case which may have resulted by the opening remark of the Souths' counsel was

sufficiently negated by the retraction statement. If the entire incident resulted in any prejudice it was probably against the Souths because their counsel placed himself in a position of having to admit to the jury that his prior statement was improper.

*(b) Parka Incident*

Prior to opening argument the Railroad made a motion *in limine* to exclude all evidence referring to the train engineer's failure to cover South with his parka or to otherwise assist South at the scene of the accident, on the ground that such evidence was prejudicial. The engineer who was operating the train at the time of the accident died prior to the commencement of the trial in this case. Prior to his death, the Souths' counsel had taken the engineer's deposition, and it was part of this deposition testimony that the Railroad sought to exclude in its motion *in limine*. The motion was denied, and during opening argument the Souths' counsel made the following statement:

"The evidence will show that as he was lying there, and I'm taking the deposition of Mr. Decker, the engineer, I says to Mr. Decker, 'Did you have anything to cover him up with?' 'No, I told the police,' he says. 'Was it cold out? What did you do?' 'I went to the cab.' I said, 'Did you have anything to cover him up with?' He said, 'My new jacket.' I says, 'Why didn't you go and cover him up?' He says, 'That was a brand-new jacket. It cost $55. I wasn't going to get it bloody. The hood cost me $7 alone and I was going to be in Devils Lake the next day and I didn't want to get cold. I wasn't going to get a jacket bloody for anybody.' I said, 'If you'd have known he was alive, would you have covered him up?' He said, 'No, I wouldn't ruin that jacket.'"

Subsequent to opening arguments, the trial court ruled in chambers that he would not allow certain parts of the engineer's deposition testimony regarding the parka incident to be read to the jury because its prejudicial effect outweighed its probative value. The trial court allowed the following portion of the engineer's deposition on this matter to be read to the jury:

"Q. [Plaintiff's counsel]: And did you know where Billy South was laying during this time?

"A. [Decker]: Yes. I saw a hump on the right-of-way there. But I didn't go over.

"Q. Did you have anything in the cab to cover him up with, blanket or anything like that?

"A. No, no.

\*    \*    \*    \*    \*    \*

"A.   .   .   . I tried to do my best to get the Highway Patrolman and police to get some covering for him.

"Q. Sure. They are the ones who are supposed to do things like that. What kind of—what day of the week was this?

"A. I think it was on a Saturday morning.

\*    \*    \*    \*    \*    \*

"Q. Okay. And if you had—

"A. In the first place, when he was layin' there I honest to God thought he was dead. Wouldn't do any good to cover him up.

\*    \*    \*    \*    \*    \*

"A. No, I just went out there with my coveralls.

"Q. I see.

"A. All the time my coat was hanging in the cab.

"Q. And before the police came how close did you walk over to Billy South to see whether or not—

\*    \*    \*    \*    \*    \*

"A. I couldn't do anything anyway. They tell you not to move an injured person, the ambulance crew.

"Q. You have heard about shock, haven't you?

"A. Yes. I never go over.

"Q. Did you ever take any courses in first aid?

"A. No.

"Q. Never?

"A. (Indicating no.)"

During closing argument, the Souths' counsel commented on the foregoing testimony.

In its instructions to the jury the trial court stated that if the jury found by a fair preponderance of the evidence that the Railroad failed to provide any necessary care for South after the accident he could recover for damages proximately resulting from such failure.

The Railroad asserts that counsel's opening statement was highly prejudicial and constitutes grounds for a new trial. The Railroad also asserts that it was improper for the Souths' counsel to comment on the parka incident during closing argument after the court had ruled to exclude such matters. The Railroad's latter assertion is based on an inaccurate premise of the trial court's ruling. The foregoing quoted portions of the deposition which were read to the jury demonstrate that the trial court did not exclude all testimony regarding the parka incident. Only certain statements made by the engineer which the court concluded were highly prejudicial and of little or no probative value were deleted from the deposition testimony. Provided the trial court did not err in admitting this evidence of the engineer's failure to assist South, then plaintiff counsel's comments during closing argument were not improper.

In order to determine whether it was error for the trial court to admit evidence of the engineer's failure to render assistance after the accident this Court must resolve, as a matter of first impression, whether there is an affirmative duty to render assistance to an injured person, and, if so, under what circumstances. Unless the engineer in this case had such an affirmative duty to assist South, all testimony regarding his failure to cover South with his parka or to otherwise assist was improperly admitted evidence—irrelevant and immaterial to any issue in the case.

During trial the Souths contended that the engineer had an affirmative duty to assist South by virtue of § 39–08–06, N.D.C.C., which imposes upon "the driver of any vehicle involved in an accident" a duty to render reasonable assistance to any person injured in such accident. We disagree that the engineer incurred a duty to assist under § 39–08–06, N.D.C.C. Trains are excluded from the definition of "vehicle" under Title 39, N.D.C.C., as follows:

"39–01–01. *Definitions.* In this title, unless the context or subject matter otherwise requires: . . .

72. 'Vehicle' shall include every device in, upon, or by which any person or property may be transported or drawn upon a public highway, except devices moved by human power or used exclusively upon stationary rails or tracks."

We conclude that the requirements of § 39–08–06, N.D.C.C., do not pertain to trains, and no duty was imposed upon the engineer of the train in the instant case by virtue of that section.

On the subject of whether there is a common law duty to assist one in peril Prosser comments as follows in his treatise, Prosser, Law of Torts, Section 56 (4th Ed. 1971):

"Because of this reluctance to countenance 'nonfeasance' as a basis of liability, the law has persistently refused to recognize the moral obligation of common decency and common humanity, to come to the aid of another human being who is in danger, even though the outcome is to cost him his life. . . ."

\* \* \* \* \* \*

"Thus far the difficulties of setting any standards of unselfish service to fellow men, and of making any workable rule to cover possible situations where fifty people might fail to rescue one, has limited any tendency to depart from the rule to cases where some special relation between the parties has afforded a justification for the creation of a duty, without any question of setting up a rule of universal application." [Footnotes omitted.]

\* \* \* \* \* \*

"It also is recognized that if the defendant's own negligence has been responsible for the plaintiff's situation, a relation has arisen which imposes a duty to make a reasonable effort to give assistance, and avoid any further harm. Where the original danger is created by

innocent conduct, involving no fault on the part of the defendant, it was formerly the rule that no such duty arose; but this appears to have given way, in recent decisions, to a recognition of the duty to take action, both where the prior innocent conduct has created an unreasonable risk of harm to the plaintiff, and where it has already injured him." [Footnotes omitted.]

The Restatement (Second) of Torts § 322 (1965) takes the following position:

"§ 322. Duty to Aid Another Harmed by Actor's Conduct

"If the actor knows or has reason to know that by his conduct, whether tortious or innocent, he has caused such bodily harm to another as to make him helpless and in danger of further harm, the actor is under a duty to exercise reasonable care to prevent such further harm."

Thus, the Restatement view is that one who harms another has an affirmative duty to exercise reasonable care to prevent further harm.

Although there is a paucity of case decisions involving this matter a few jurisdictions have discussed the issue. *See, Annot.,* 33 A.L.R.3d 301 (1970). The Supreme Court of North Carolina held in *Parrish v. Atlantic Coast Line R.R. Co.,* 221 N.C. 292, 20 S.E.2d 299 (1942), that one who negligently harms another must take all steps necessary to mitigate the harm. *See, also, Whitesides v. Southern Railway Co.,* 128 N.C. 229, 38 S.E. 878 (1901). The Appellate Court of Indiana in *Tubbs v. Argus,* 140 Ind.App. 695, 225 N.E.2d 841 (1967), after quoting approvingly from § 322 of the Restatement (Second) of Torts, held that ". . . an affirmative duty arises to render reasonable aid and assistance to one who is helpless and in a situation of peril, when the injury resulted from the use of an instrumentality under the control of the defendant." *See also, L. S. Ayres & Co. v. Hicks,* 220 Ind. 86, 40 N.E.2d 334 (1942).

We believe that the position expressed by § 322, Restatement (Second) of Torts (1965), reflects the type of basic decency and human thoughtfulness which is generally characteristic of our people, and we therefore adopt the standard imposed by that section. Accordingly, we hold that a person who knows or has reason to know that his conduct, whether tortious or innocent, has caused harm to another has an affirmative duty to render assistance to prevent further harm. One who breaches such duty is subject to liability for damages incurred as a result of the additional harm proximately caused by such breach. We further hold that, in the instant case, the trial court did not err in the admission of the engineer's testimony regarding the assistance, or lack thereof, to South at the scene of the accident, nor did the court abuse its discretion in refusing to admit those portions of the testimony which the court determined were highly prejudicial and irrelevant.

During opening argument to the jury, the Souths' counsel referred to statements made by the engineer as to why he did not cover South with his jacket. As noted previously, some of those statements were never admitted into evidence because of the court's ruling that they were highly prejudicial. As part of its instructions to the jury the trial court gave a standard instruction that the arguments or other remarks of the attorneys were not to be considered as evidence in the case and that any comments by counsel concerning the evidence which were not warranted by the evidence actually admitted were to be wholly disregarded. We recognize the reality of a situation such as this wherein inflammatory comments made by counsel during opening argument, once impressed upon the minds of the jurors, can perhaps never be totally erased or their effect completely negated by an instruction that such comments are not evidence and should be wholly disregarded. Nevertheless, in view of the instruction as given and in view of the proper limited admission into evidence of the engineer's testimony regarding his failure to assist South after the accident we hold that the disputed comments of the Souths' counsel in opening argument did not constitute prejudicial error entitling the Railroad to a new trial.

### (c) Post-accident Changes

The Railroad asserts that testimony was improperly admitted involving two separate areas of post-accident changes resulting in reversible error entitling the Railroad to a new trial.

The Railroad contends that prior to trial it made a motion *in limine,* which was granted by the trial court, to exclude all evidence of post-accident changes. According to our review of the transcript the foregoing contention inaccurately portrays what occurred with respect to the Railroad's motion *in limine.* Subsequent to the Railroad's in-chambers motion *in limine* to exclude all evidence of post-accident changes counsel for the parties reached an agreement that no mention of post-accident changes would be made during the *voir dire* of the jury and that any objections to the admission of such evidence subsequent to *voir dire* would have to be made separately. Such agreement was reached after the Souths' counsel objected to excluding evidence that certain lilac bushes which obstructed one's view of the railroad tracks from Barrett Avenue had been removed subsequent to the accident. The Souths' counsel objected to excluding such evidence because certain photographs allegedly stipulated by counsel for admission into evidence showed that the lilac bushes had been removed. Thus, the pre-trial motion *in limine* to exclude post-accident changes resulted in an agreement not to mention such evidence during *voir dire* but which did not extend beyond that phase of the trial.

During the trial, while Gerald Cysewski, one of the Souths' expert witnesses, was testifying as to various obstructions to one's view of Barrett Avenue, he made the following statement:

"Q. Okay, I forgot to ask you what the obstruction was at 50 feet.

"A. At 50 feet there was some bushes but there had been a large lilac bush which had a base 10 by 12 and had at the time, by the time I got there, been cut. But it was lilac. I could identify it as a lilac bush because the leaves were still there."

The Railroad made no objection to this statement nor did the Railroad move to strike any part of the answer or for the court to admonish the jury to disregard it. The Railroad, however, did make a subsequent in-chambers motion for a mistrial because of the admission of the foregoing testimony. The motion was denied, but the trial court admonished counsel that it would not tolerate further such statements by the Souths' witnesses.

■ We conclude that the Railroad failed to make a proper and timely objection to the foregoing testimony upon which to predicate reversible error. In view of the statement of the Souths' counsel during the pretrial motion *in limine* that he considered such evidence admissible because of the stipulated photographs the Railroad should have been fully aware that the Souths' counsel intended to introduce such evidence. We conclude that the Railroad failed to preserve this error for appeal.

■ A second evidentiary item of alleged post-accident change involves a gyrolite, located on the engine of the train involved in the accident, which flashes a rotating beam of light. During the trial the Souths' expert witness, Whitman, was asked whether, during his calculations, he had considered that the gyrolite was 12 feet above the rail. He responded:

"A. About 12 feet above the rail, yes. Of course I was never able to measure one of them. I tried to locate a train with a gyrolite and I couldn't find one. They have now chained on two strobe lights on the side of the train."

Upon motion by the Railroad the foregoing answer was stricken and the jury was instructed by the court to disregard it. Also, during cross-examination, the Railroad's expert witness, Dean Ellsworth, an engineer employed by AMTRAK, testified that gyrolites have been "specified for new equipment." There was no objection by the Railroad to the question. The Souths' counsel also briefly questioned Ellsworth concerning the use of gyrolites and strobe lights on

trains, and the Railroad objected only once to the following specific question:

"Q. What we're really talking about is the equipment that has been superseded in mechanical efficiency.

"[Railroad's counsel]: Object, it's irrelevant, incompetent and calls for a legal conclusion.

"[The Souths' counsel]: Going into the question of effect, Your Honor.

"THE COURT: Sustained."

Most of the testimony regarding gyrolites and strobe lights was admitted without objection by the Railroad. The two instances in which objection was made by the Railroad the trial court sustained the objections and a proper cautionary instruction was given to the jury. We conclude that with respect to the admission of this evidence the Railroad has presented no basis upon which to predicate reversible error.

#### (d) Table-Pounding Incident

While questioning South on redirect examination the Souths' counsel asked him "Now then, how would you have modified your behavior on that morning if there had been a blowing of the whistle?". Counsel for the Railroad objected to the question and the objection was sustained. The Souths' counsel then rephrased the question to which there was a second objection which was also sustained, and the following exchange immediately followed:

"[The Souths' counsel]: I guess maybe I'd like to be heard. I don't understand.

"[Railroad's counsel]: Counsel very well understands.

"[The Souths' counsel]: I don't, either, and I'm not accustomed to being called a liar.

(Whereupon . . . [the Souths' counsel] pounds counsel table.)

"THE COURT: Counsel will be seen in chambers and I would not have anymore remonstrances in Court by counsel such as that in front of the jury. If you wish to pound on the desk in my office, you may do so, but not before the jury. We'll see counsel in chambers."

The Railroad asserts that the pounding of the table by the Souths' counsel resulted in reversible error. We disagree. In view of the trial court's warning to the Souths' counsel, in the presence of the jury, that the court would not tolerate any such future "remonstrances", any prejudice resulting from the incident would have probably been against the Souths. It is inconceivable that such incident could have resulted in jury prejudice against the Railroad.

#### (e) Repeated Questions

The Railroad also asserts that reversible error was committed "throughout the trial" when the Souths' counsel would repeat a question that had previously drawn an objection which the trial court had sustained, thereby allegedly forcing the Railroad to make a second and third objection. The only specific instance of such conduct to which the Railroad has referred involves the questions asked by the Souths' counsel just prior to the table-pounding incident. Upon reviewing the transcript we conclude that the Souths' counsel did not repeat the same question to which an objection had been sustained. Rather, the Souths' counsel substantially rephrased the question in an apparent attempt to elicit testimony acceptable to the trial court. Accordingly, we conclude that no error was committed in this regard.

#### (f) South's driving record

During closing argument the Souths' counsel made comments to the effect that the Railroad's failure to introduce any record of driving violations by South implied that South was a careful driver who acted non-negligently at the time of the collision with the Railroad's train. The Railroad asserts it was reversible error for the Souths' counsel to remark about the failure to introduce South's driving record because such evidence was not admissible.

The Railroad's assertion is correct that evidence of one's past driving record is inadmissible to prove that a person acted negligently on the occasion in dispute. *Thornburg v. Perleberg*, 158 N.W.2d 188 (N.D.1968). *See also, Trautman v. New*

*Rockford-Fessenden Co-op Transport Ass'n,* 181 N.W.2d 754 (N.D.1970); *Knoepfle v. Suko,* 108 N.W.2d 456 (N.D.1961). Furthermore, it is error for counsel to comment on the other parties' failure to introduce evidence which would have been inadmissible. *Bulleri v. Chicago Transit Authority,* 41 Ill. App.2d 95, 190 N.E.2d 476 (1963); *Citizens' Nat. Bank v. Morgan,* 94 N.H. 284, 51 A.2d 841 (1947).

Subsequent to counsel's improper remarks the trial court admonished the jury as follows:

". . . a person's driving record is not admissible for any purpose in [a] civil action arising out of an incident relating to driving and so there has been no such testimony and none should be included nor would it be appropriate to argue the absence thereof . . ."

We conclude that the foregoing admonition to the jury by the trial court sufficiently negated counsel's improper comments, and that, therefore, such incident did not result in reversible error.

*(g) "Other" Improper Remarks*

The Railroad asserts that the Souths' counsel made a number of "other" improper and prejudicial remarks during his closing argument resulting in reversible error entitling the Railroad to a new trial.

The determination to grant or deny a new trial by reason of the misconduct of counsel rests within the sound discretion of the trial court, and, in the absence of a clear abuse of discretion, its determination will not be reversed on appeal. *Kresel v. Giese,* 231 N.W.2d 780 (N.D.1975); *Hogan v. Knoop,* 191 N.W.2d 263 (N.D.1971). We have reviewed the closing argument of the Souths' counsel, keeping in mind the alleged improper remarks raised by the Railroad on appeal, and we conclude that the trial court did not abuse its discretion in denying the Railroad a new trial by reason of counsel's conduct during closing argument.[6]

6. Although we do not condone improper conduct of counsel it is our opinion that the courts

## TESTIMONY—CROSSBUCK MAINTENANCE

The Railroad asserts that the trial court committed prejudicial error by admitting evidence concerning the Railroad's maintenance of the crossbuck sign at the Barrett Avenue crossing. The Souths introduced such testimony to show that, because of the improper placement of the sign and the failure to maintain reflectorized material on the sign, South was misled as to his actual distance from the track. The Souths assert that a properly maintained crossbuck sign would have more adequately warned South of his distance from the track which would have perhaps caused him to slow the speed of his vehicle in time to see the train and avoid a collision. The Railroad asserts that, because South testified that he was generally aware of the location of the tracks, improper maintenance of the crossbuck sign could not have been a proximate cause of the accident, and, therefore, such evidence was irrelevant and inadmissible.

Upon reviewing the transcript we have been unable to find an objection by the Railroad to the admission of this evidence on the ground now raised on this appeal. Furthermore, during an in-chambers hearing the Railroad's counsel made the following statement whereby he conceded that maintenance of the crossbuck sign was properly at issue in the case:

"The witness has also usurped the function of the administrative agency that has direct legislative mandate with respect to railroad grade crossing safety. This is not an issue that should be even discussed on the grounds that *there is no basic duty on the railroad to have other than a crossbuck in good repair. No question about the fact that the crossbuck is in issue.* The sight distances are not in issue. Safe stopping distances are not in issue. The crest of the vertical curving, the inside railroad curving and the skewness and the foliage on the road, no level road, and so-called steep upgrade should minimize their interference with counsel's trial strategy.

are not in issue. These are matters for determination by the North Dakota Public Service Commission and not for this jury." [Emphasis added.]

Notwithstanding the fact that counsel did not properly preserve this issue for review we believe that the crossbuck maintenance testimony was properly admitted under the circumstances of this case. Even though South was aware of the general location of the railroad track, he testified that the morning of the accident was the first time he had traveled by way of the Barrett Avenue crossing. Thus, there was sufficient evidence to present a jury question as to whether or not an improperly maintained crossbuck sign was a proximate cause of the accident.

## TESTIMONY—NOTICE OF DANGEROUS CROSSING

During the trial the Souths' counsel elicited testimony from two witnesses that on separate occasions prior to South's accident each witness had informed a railroad employee that the Barrett Avenue crossing was dangerous. On appeal the Railroad asserts that such testimony was inadmissible because there was no evidence that the person receiving the notice had any responsibility or authority to receive such notice on behalf of the Railroad. The Railroad also asserts that such testimony reflected mere lay opinion of the dangerous character of the crossing which could not constitute an effective notice to the Railroad.

The knowledge possessed by the Railroad, if any, of existing dangerous characteristics of the Barrett Avenue crossing is a relevant factor in the determination of whether the Railroad acted negligently. Under the circumstances of this case the objections raised by the Railroad to the admission of such testimony go to the weight of the testimony and not its admissibility. We conclude that no reversible error was committed by the admission of this evidence.

## DAMAGES—FUTURE NURSING CARE

During the trial Dr. David Ramsett testified, among other things, to the cost of future nursing care for South. Ramsett holds a doctorate degree in economics, and, at the time of trial, was an economics professor and head of the Department of Economics at the University of North Dakota. Ramsett testified that he assumed South's disability would necessitate future nursing care; however, Ramsett was unable to give a medical opinion of South's need for nursing care because his area of expertise was economics and not medicine. Based on the assumption that South required future nursing care Ramsett calculated the present value of future nursing care required by South to be $116,774. In his calculations Ramsett used a nursing care requirement of 20 hours per week for the duration of South's life expectancy and a wage rate for unskilled nursing care of $3.00 per hour to which he added an 8% annual increase.

The trial court, in its instructions to the jury, included the following as an item of damage:

"2. The reasonable value of medical, surgical, hospital and other services, care and supplies which you find reasonably certain to be required in the future treatment of the plaintiff."

The Railroad asserts that prior to the commencement of trial South had incurred no expense for personal nursing care because his wife, Delores, had gratuitously provided all necessary care for South, that no evidence was introduced to prove South would actually incur nursing care expense in the future; and that, based on the foregoing reasons, South was not entitled to damages for future nursing care expenses.

There is a split of authority as to whether or not an injured person may recover, as an element of damages, the reasonable value of medical care and treatment which is provided gratuitously, without charge. See, Frumer & Friedman, 3 *Personal Injury*, § 3.04[E], (1965); Annot., 90 A.L.R.2d 1323 (1963). We believe the better reasoned rule is that an injured person can recover, as an element of damages, the reasonable value of medical care and treatment rendered, even though such care

or treatment is provided gratuitously, without charge. *See, Tyminski v. United States*, 481 F.2d 257 (3rd Cir. 1973); *City of Tucson v. Holliday*, 3 Ariz.App. 10, 411 P.2d 183 (1966); *Albano v. Yee*, 219 A.2d 567 (D.C.Ct.App.1966); *Oddo v. Cardi*, 100 R.I. 578, 218 A.2d 373 (1966); *City of Englewood v. Bryant*, 100 Colo. 552, 68 P.2d 913 (1937); *Legler v. Muscatine Clinic*, 207 Iowa 720, 223 N.W. 405 (1929); *Lake Erie & W. R. Co. v. Johnson*, 191 Ind. 479, 133 N.E. 732 (1922); *Crouse v. Chicago & N. W. Ry. Co.*, 102 Wis. 196, 78 N.W. 446 (1899); *Brosnan v. Sweetser*, 127 Ind. 1, 26 N.E. 555 (1891). Just as the collateral source rule precludes a tortfeasor from claiming the benefit of compensation received by an injured person from independent sources, so, too, the tortfeasor should not be allowed to benefit from an injured person's good fortune of having available to him gratuitous medical care.

■ The Railroad also asserts that it was error to allow the jury to consider the cost of future nursing care as an element of damages because there was no testimony or other evidence to prove, with a reasonable medical certainty, that South would require such future nursing care. Pursuant to § 32–03–03, N.D.C.C., damages may be awarded for detriment "certain to result in the future.". In order to recover for future medical services there must be substantial evidence to establish with reasonable medical certainty that such future medical services are necessary. *Holecek v. Janke*, 171 N.W.2d 94 (N.D.1969).

Both South and his wife, Delores, testified that as a result of the injuries to South's left shoulder and right arm he required assistance to dress himself, to comb his hair, and to shower. They also testified that South was unable to drive a vehicle since his accident because he could not adequately maneuver the steering wheel. Delores further testified that subsequent to the accident South had fallen on more than one occasion and that it was impossible for him to get up without assistance. In addition to the foregoing testimony, Dr. John Beaumier, a specialist in orthopedics who treated South for the injuries he received during the accident, testified that the injury to South's left shoulder was permanent and would not improve and that it was also possible that South's injured right arm would never improve. He further testified that as a result of his injuries South had developed arthritic conditions of the right shoulder and right elbow which would continue to get worse.

■ We conclude that the foregoing testimony presents substantial evidence upon which the jury could infer that with reasonable medical certainty South would require future nursing care services to the extent calculated by the economist, Dr. Ramsett. Accordingly, we conclude that the trial court did not err in allowing the jury to consider future nursing care as an element of damages.

## MOTIONS FOR DIRECTED VERDICT AND FOR JUDGMENT NOTWITHSTANDING THE VERDICT

At the close of the Souths' case, and again at the close of the Railroad's case, the Railroad moved for a directed verdict asserting that, as a matter of law, South was more negligent than the Railroad, or, in the alternative, that South was negligent to some degree, leaving for jury determination the apportionment of negligence between South and the Railroad. The motions were denied by the trial court. Subsequent to the entry of the judgment the Railroad moved for a judgment notwithstanding the verdict. The Railroad also made a separate motion for a new trial. Both motions were denied. The Railroad asserts on appeal that the trial court erred in denying the foregoing motions.

■ Neither a motion for directed verdict nor a motion for judgment notwithstanding the verdict should be granted unless the moving party is entitled to judgment on the merits as a matter of law. *Staiger v. Gaarder*, 258 N.W.2d 641 (N.D. 1977); *Jamestown Terminal Elevator, Inc. v. Hieb*, 246 N.W.2d 736 (N.D.1976).

We have reviewed the evidence in this case, and we conclude that such evidence presented a jury question as to whether or not there was negligence on the part of South which was a proximate cause of the accident. There are a number of facts supported by the record in this case which, collectively, preclude a determination that South was negligent as a matter of law.

The record would support a finding that as South approached the crossing he was traveling 15 m. p. h. or less. Section 39–09–02, N.D.C.C., provides that it "presumably shall be lawful" for a driver to travel at a speed of 20 m. p. h. when approaching within 50 feet of an obstructed crossing. Therefore, the jury could have found that South was traveling well within the lawful maximum speed limit. Of course, South had a duty to drive with reasonable care and caution under the existing driving conditions, and we do not imply that if South was driving within the lawful maximum speed limit the jury could not find him negligent for driving too fast under the existing conditions. We do conclude, however, that reasonable minds could differ with respect to the question of whether or not South was traveling at a negligent rate of speed, and, therefore, the question of such negligence was for the jury to decide.

Prior to the morning of the accident South had never traveled across the Barrett Avenue crossing. Consequently, he was not familiar with the obstructions at the crossing which created, in the opinion of at least one expert witness, a hazardous situation for drivers attempting to cross the railroad tracks at Barrett Avenue. Furthermore, the record would support a finding that the extent and nature of the obstructions were not obvious to a driver unfamiliar with the crossing nor was the danger they created readily apparent to such a driver. If South had been familiar with the nature of the Barrett Avenue crossing perhaps his failure to exercise greater care than he actually did

on the morning of the accident would have constituted negligence as a matter of law, but that is not the evidence before us.

The record would also support a finding that South looked in both directions in an attempt to see a train and that he also listened for the train's whistle. South testified that although he looked and listened he neither saw nor heard the train, and there is evidence in the record, other than evidence implying South was negligent, that would explain why he did not see or hear the train in time to avoid the collision. Experts testified that the obstructions to South's view at the crossing, under the circumstances of the situation, including, among other things, vehicle speeds and road conditions, absolutely precluded South from being able to see the train in time to avoid the collision. Also, there were several witnesses who testified that although they were in a position to hear the train whistle on the morning of the accident they did not hear the whistle blow.

The Railroad cites a number of North Dakota cases in which the Court determined that a motor vehicle driver involved in a railroad crossing accident was negligent as a matter of law. *Stelter v. Northern Pac. Ry. Co.*, 71 N.D. 214, 299 N.W. 310 (1941); *Zeis v. Great Northern Ry. Co.*, 61 N.D. 18, 236 N.W. 916 (1931); *Marshall v. Northern Pacific Ry. Co.*, 58 N.D. 626, 227 N.W. 55 (1929); *Rattie v. Minneapolis, St. Paul & S. S. M. Ry. Co.*, 55 N.D. 686, 215 N.W. 158 (1927); *Haugo v. Great Northern Ry. Co.*, 27 N.D. 268, 145 N.W. 1053 (1914); *Hope v. Great Northern Ry. Co.*, 19 N.D. 438, 122 N.W. 997 (1909).

In *Stelter; Zeis; Marshall*[7]; *Rattie*; and *Haugo*, the motor vehicle drivers all had an unobstructed view of the railroad tracks which would have allowed them to see the approaching train in time to avoid a collision if they had carefully looked for a train. In the *Hope* case the plaintiff drove his team of horses over the main track into the

---

7. The plaintiff in *Marshall* testified that he was unaware of the railroad track because the weeds and grass obstructed his view. The court determined that this testimony was an "arbitrary pronouncement" contrary to all evidence, and that there was nothing to prevent the plaintiff from seeing the train "for a considerable distance down the track."

side of the train engine. Although the plaintiff's view of the main track was obstructed by three grain elevators and freight cars standing on the side tracks the evidence showed that the plaintiff was familiar with the crossing and was aware of the obvious obstructions to his view.

There are additional distinguishable facts in each of the foregoing cases by which we could further demonstrate that it would be improper for this court to follow those decisions in the instant case and to find South negligent as a matter of law. Suffice it to say that on the record before us the question of South's negligence was for the jury to decide. The Railroad was not entitled to a judgment against South as a matter of law. Accordingly, the trial court did not commit error in denying the Railroad's motions.

The order of the district court denying the Railroad's motion for judgment notwithstanding the verdict or, in the alternative, for a new trial is affirmed.

The judgment of the district court is affirmed.

ERICKSTAD, C. J., and VANDE WALLE, SAND and PEDERSON, JJ., concur.